1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   Dilevon Lo, et al.,                          No. 2:21-cv-00999-KJM-DMC

12                  Plaintiffs,                    ORDER

13        v.

14   County of Siskiyou, et al.,

15                  Defendants.

16

17        Siskiyou County, California recently passed several ordinances and resolutions intended
18   to root out illegal and water-intensive cannabis cultivation during a severe drought.  The plaintiffs
19   in this lawsuit claim the drought is a pretext.  In reality, they allege, the County intends to expel a
20   disfavored community of Asian Americans by cutting off its only water supply.  They move for a
21   temporary restraining order barring the County from enforcing its ordinances until the court can
22   hear and decide a more formal motion for temporary injunctive relief.

23        Although the plaintiffs have advanced concerning claims of racial discrimination, they
24   have not shown that they, as opposed to someone else, will likely suffer an irreparable injury if
25   the court does not immediately forbid the County from enforcing the disputed ordinances.  Nor
26   have the plaintiffs proven an immediate injunction would serve the broader public interests at
27   stake here.  **The motion is denied**, as explained in more detail below.

1

1  I.   **BACKGROUND**

2     The plaintiffs challenge three County ordinances.  The first is an urgency ordinance the

3  County adopted on August 4, 2020.  *See* Siskiyou Cty. Ord. No. 20-13 (Aug. 4, 2020), Lawrence

4  Decl. Ex. A, ECF No. 4-2.  According to that ordinance, the Board of Supervisors found "the

5  extraction and discharge of groundwater" in the County "for use in cultivating cannabis" was

6  "inconsistent with" the California Constitution and the California Water Code because the County

7  was "in a state of drought" or "extreme drought."  *Id.* § 1.I–J.  "Cannabis is a water-intensive

8  crop," the ordinance explains, and "thousands of illegal Cannabis Cultivation sites" had been

9  established within the County.  *Id.* § 1.L–M.  Officers had also seen "large quantities of

10  groundwater being extracted from local wells and then delivered in water trucks to illegal

11  Cannabis Cultivation sites."  *Id.* § 1.N.  The County estimated three million gallons of water was

12  used every day to grow cannabis within its borders.  *Id.* ¶ 1.O.  For these reasons, the County

13  added several prohibitions to its municipal code:

14     (a) No person or entity shall engage in the act of wasting or unreasonably using
15     groundwater by extracting and discharging groundwater underlying Siskiyou
16     County for use in cultivating cannabis in violation of Chapter 14 or Chapter 15 of
17     Title 10 of the Siskiyou County Code.

18     (b) No person or entity shall permit the existence of any public nuisances, as defined
19     in this Article, to exist on property in his or her ownership or possession and control.

20     (c) No person shall knowingly use water extracted in violation of this section.

21  *Id.* § 3 (amending Siskiyou Cty. Code § 3-13.702).  Although these provisions were originally

22  passed under rules that apply to urgent circumstances, the County is now enforcing the ordinance

23  on a more permanent basis.  *See* Opp'n at 5 n.2, ECF No. 7.

24     The County adopted the second challenged ordinance several months later, on May 4,

25  2021.  *See* Siskiyou Cty. Ord. No. 21-07 (May 4, 2021), Lawrence Decl. Ex. B, ECF No. 4-2.  It

26  passed this ordinance on an urgent basis, and included many similar findings about droughts, the

27  depletion of groundwater, and illegal cannabis cultivation.  *See id.* § 1.  The Board of Supervisors

28  also described "complaints" about "land use violations and undesirable effects on groundwater

29  resources and local wells."  *Id.* § 1.N.  And again, according to the ordinance, officers had seen

1   trucks delivering groundwater to "illegal cannabis cultivation sites." *Id.* § 1.O.  The Sheriff had

2   updated his "estimates of the water expended daily on illicit cannabis production." *Id.* § 1.Q.

3   Now he believed the total was almost ten million gallons per day. *Id.*  The second ordinance also

4   adds several provisions to the County Code.  These provisions require an administrative permit

5   whenever groundwater is extracted for use on a different parcel from the extraction site, subject to

6   several exceptions, including for "emergency services." *See id.* § 3 (amending Siskiyou Cty.

7   Code § 3.5-13.102).  The County can issue permits only after review by several County

8   departments, including Community Development. *Id.* (amending Siskiyou Cty. Code § 3.5-

9   13.103).  Violations are punishable by fines and injunctions. *See id.* § 6 (amending Siskiyou Cty.

10   Code § 3-13.601).

11        The County adopted the third challenged ordinance on the same day as the second: May 4,

12   2021. *See* Siskiyou Cty. Ord. No. 21-08 (May 4, 2021), Lawrence Decl. Ex. C, ECF No. 4-2.

13   After reiterating findings about droughts and illegal cannabis cultivation, *see id.* § 1, this

14   ordinance imposes restrictions on water trucks carrying more than 100 gallons on any "streets"

15   and "highways" the Board of Supervisors might specify, *see id.* § 3 (amending Siskiyou Cty.

16   Code § 3-4.1501).  Violations are subject to fines and misdemeanor charges, which are

17   punishable under a separate provision by up to six months' imprisonment under another code

18   section. *See id.* (amending Siskiyou Cty. Code § 3-4.1503, in turn citing § 1-2.01).  The street-

19   specific prohibition does not apply to "emergency vehicles," and the County's Director of Public

20   Works has "direction" to issue a "special permit" exempting water trucks from these prohibitions

21   if an applicant shows "good cause" in writing. *Id.* (amending Siskiyou Cty. Code §§ 3-4.1504 to

22   1505).

23        On the same day the last two ordinances were adopted, the Board of Supervisors passed a

24   resolution listing the "streets" and "highways" where the street-specific prohibition of the last

25   ordinance would be enforced. *See* Resolution, Lawrence Decl. Ex. D, ECF No. 4-2.[1]  According

26   to a private investigator who submitted a declaration with the plaintiffs' motion, these roads are

_____

        [1] The resolution attached to the plaintiffs' motion is neither numbered nor signed, but the County does not dispute that it went into effect on May 4, 2021. *See* Opp'n at 7.

1    all found in a part of the County where many Hmong refugees live, and one of the roads is the

2    only way into and out of the refugee community.  *See* Szendrey Decl. ¶¶ 32–36, ECF No. 4-5.

3    These refugees first began arriving in Siskiyou County in about 2015, many from Minnesota.  *See*

4    Mot. at 3 (citing Paige St. John, "Hmong Pot Growers in Siskiyou County Seeking Identity,

5    Profit—or Both," *L.A. Times* (Sept. 10, 2017), Lawrence Decl. Ex. H, ECF No. 4-2); Szendrey

6    Decl. ¶ 17.

7          Some people in the Hmong community do illegally cultivate marijuana, a point on which

8    the parties seem to agree.  *See* Mot. at 15; Siskiyou Cty. 2021 Annual Strategic Plan, Szendrey

9    Decl. Ex. B, ECF No. 4-5; Opp'n at 2–3.  The plaintiffs claim, however, that the Hmong

10   community has been singled out by the County through the three ordinances reviewed above.  *See*

11   Mot. at 15; Reply at 3, ECF No. 9.  To explain, plaintiffs mapped the constellation of suspected

12   grow sites identified by the County in a recent report and the roads restricted by the County's

13   recent ordinances.  *See* Mot. at 15–16 (citing Szendrey Decl. Exs. B & C).  The map identifies

14   six large areas where grow sites are concentrated.  *See* Szendrey Decl. Ex. C.  Four of these six

15   large areas are not near any roads where water trucks are prohibited.  *See id.*  According to the

16   County's report, only a tiny fraction of the thousands of suspected grow sites within its borders

17   are located in the Mount Shasta Vista subdivision, where a disproportionately large number of

18   people identify as Hmong.  *See id.* Ex. B at 30–31;[2] Neil Thao Decl. ¶ 3, ECF No. 4-8.  The

19   County's Director of Community Development attributes the discrepancy between the relatively

20   broad geographic scope of illegal marijuana cultivation and the small area where trucks are

21   restricted to the unusually high concentration of illegal cannabis operations in the Mount Shasta

22   Vista subdivision.  *See* Dean Decl. ¶¶ 7, ECF No. 8-1.[3]  The County targeted this subdivision

23   because of the "widespread discharge of human waste, trash, and refuse into and onto the ground

24   from illegal, unpermitted dwellings and other widespread environmental violations."  *Id.*

---

[2] To avoid confusion, pages of this exhibit are cited using the numbers applied to the top right of each page by the CM/ECF system.

[3] The court grants the County's request to consider this declaration despite its delayed filing.  *See* J. Scott Donald Letter (June 10, 2021), ECF No. 8.  The plaintiffs do not oppose that request, and the delay appears to have caused no prejudice.

1    In addition to their claims of a geographic mismatch, the plaintiffs also argue the County's

2  ordinances and street listings sweep in more traffic than necessary.  The ordinances restrict all

3  off-site water use and all non-emergency vehicles carrying more than 100 gallons of water, no

4  matter whether it is used for illegal cannabis cultivation or another purpose.  *See* Ord. No. 21-07

5  § 3; Ord. No. 21-08 § 3.  As a result, the plaintiffs claim, many Hmong people will be deprived of

6  water they need to survive.[4]  Sheriff's Deputies have stopped, cited, and seized trucks from

7  Hmong people who claimed to know nothing about marijuana and who were not carrying water.[5]

8  Two houses have burned down because water was in short supply.  *See generally*

9  Suewasiengboom Saiaaron Lee Decl., ECF No. 4-9.  The plaintiffs attribute the water restrictions

10  to anti-Asian racism and public antipathy toward the County's Hmong residents.  *See* Neil Thao

11  Decl. ¶ 11; *see also, e.g.*, Marjorie King Decl. ¶ 9, ECF No. 4-15 (describing racism and

12  intimidation); Koua Lee Decl. ¶ 11, ECF No. 9-8 (same); Khue Cha Decl. ¶ 7, ECF No. 9-10

13  (same).

14    Finally, the plaintiffs point to inconsistencies between the County's formal findings and

15  what its officers have said elsewhere.  The District Attorney told *The Sacramento Bee* that the

16  ordinances were "not designed to protect the aquifer, or the ground water" but rather "to enforce

17  California's and Siskiyou's cannabis laws."  Xavier Mascareñas, "Asian Pot Growers Face

18  Sheriff Raids, Bulldozers in Northern California," *The Sacramento Bee* (May 26, 2021),

19  Lawrence Decl. Ex. M, ECF No. 4-2.  The Sheriff has also encouraged public participation in

20  enforcing the County's ordinances, which the plaintiffs characterize as a veiled invitation to racist

21  vigilante justice.  *See* Mot. at 10–12.  For example, the Sheriff told the Board of Supervisors that

22  it was "not just the Sheriff's Department or code, or the board, or the county," but "everybody"

23  who should be involved.  Testimony of Sheriff Jeremiah LaRue to the Siskiyou Cty. Bd. of

24  Supervisors at 8:235–36 (May 4, 2021), Lawrence Decl. Ex. O-2, ECF No. 4-2.  "I just want to

---

[4] Neil Thao Decl. ¶ 8; Vamntxawg Lee Decl. ¶¶ 7–8, ECF No. 4-14; Nhia Thai Vang Decl. ¶¶ 9–12, ECF No. 9-5; Mai Yang Lee Decl. ¶¶ 12–14, ECF No. 9-7.

[5] *See generally* Antonio Lee Decl., ECF No. 4-6; Jeffrey Vang Decl., ECF No. 4-7; Mao Thao Decl., ECF No. 4-10; Pao Lee Decl., ECF No. 4-11; Nathan Thao Decl., ECF No. 4-12; Dilevon Lo Decl., ECF No. 4-13; Mao Thao Suppl. Decl., ECF No. 9-3; Jerry Vang Suppl. Decl., ECF No. 9-4; Pao Lee Suppl. Decl., ECF No. 9-9.

1   convey the seriousness of this," he testified, "and that we're going to go out and aggressively

2   enforce it."  *Id.* at 8:237–38.  And later, in a Facebook post, the Sheriff's Office asked "for

3   additional heavy equipment, such as dozers and excavators, and trained operators to volunteer to

4   assist in ongoing efforts to address the illegal Commercial Cannabis Activity plaguing [the]

5   county."  Siskiyou Cty. Sheriff, Facebook Post (May 21, 2021 6:00 p.m.), Lawrence Decl. Ex. N,

6   ECF No. 4-2.  The plaintiffs claim these posts and other statements have inflamed local passions

7   and incited armed raids on Hmong land.  *See, e.g.*, Reply at 3–4; Suppl. Szendrey Decl. ¶¶ 32–35,

8   ECF No. 9-12.  These claims, however, are based on second- and third-hand accounts whose

9   accuracy is difficult to assess.

10          This action was filed a few weeks ago, one month after the County passed the two most

11   recent ordinances.  *See* Compl., ECF No. 1.  The plaintiffs assert three claims under section 42

12   U.S.C. § 1983: (1) a claim for declaratory and injunctive relief to prevent violations of the

13   Fourteenth Amendment's Due Process and Equal Protection clauses, *see id.* ¶¶ 50–84; (2) a claim

14   for damages based on violations of the same clauses, *see id.* ¶¶ 85–90; and (3) a claim for

15   damages based on violation of Fourth Amendment protections of "'the privacies of life' against

16   'arbitrary power,'" *id.* ¶ 92 (quoting *Carpenter v. United States*, 138 S. Ct. 2206, 2214 (2018)).

17          The plaintiffs moved ex parte for a temporary restraining order late on the same Friday

18   their complaint was filed, setting a hearing for the following Monday morning, which was the

19   soonest date and time the CM/ECF system permitted.  *See generally* Mot.; Reply at 2.  They

20   propose an order barring the County from enforcing the challenged ordinances until the court can

21   hear and decide a preliminary injunction motion.  *See generally* Proposed Order, ECF No. 4-3.

22   The court vacated the hearing, denied the request for ex parte relief, and ordered a response on an

23   accelerated schedule.  Minute Order, ECF No. 5.  The County opposed the motion, the plaintiffs

24   replied, and the court then submitted the matter.  *See* Opp'n, ECF No. 7; Reply, ECF No. 9.

25   **II.    LEGAL STANDARD**

26          A temporary restraining order may be issued upon a showing "that immediate and

27   irreparable injury, loss, or damage will result to the movant before the adverse party can be heard

28   in opposition."  Fed. R. Civ. P. 65(b)(1)(A).  The purpose of such an order is to preserve the

1  status quo and to prevent irreparable harm "just so long as is necessary to hold a hearing, and no

2  longer." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 439 (1974). A

3  temporary restraining order is an extraordinary remedy, and a plaintiff who requests one must

4  prove that remedy is proper. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

5  When courts determine whether to issue a temporary restraining order, they rely on the

6  same factors that guide the evaluation of a request for a preliminary injunction: whether the

7  moving party "is likely to succeed on the merits," is "likely to suffer irreparable harm in the

8  absence of preliminary relief," whether "the balance of equities tips in [its] favor," and whether

9  "an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20

10  (2008); *see Stuhlbarg Int'l. Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir.

11  2001) (stating that the analysis for temporary restraining orders and preliminary injunctions is

12  "substantially identical"). Alternatively, courts within this circuit may consider a request for a

13  temporary restraining order using a "sliding scale" test in which "a stronger showing of one

14  element may offset a weaker showing of another." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d

15  1127, 1131 (9th Cir. 2011). For example, a stronger showing of irreparable harm might offset a

16  lesser showing of likely success on the merits. *Id.*

17  This District's local rules also impose specific requirements on those who request a

18  temporary restraining order. *See* E.D. Cal. L.R. 231. Among other things, these rules require

19  "actual notice to the affected party and/or counsel" except in "the most extraordinary of

20  circumstances." E.D. Cal. L.R. 231(a). "Appropriate notice would inform the affected party

21  and/or counsel of the intention to seek a temporary restraining order, the date and time for hearing

22  to be requested of the Court, and the nature of the relief to be requested." *Id.* A party who moves

23  for a TRO must also confirm it has complied with local rules by filing the checklist available on

24  this court's website.[6]

25  When deciding whether to issue a temporary restraining order, the court may rely on

26  declarations, affidavits, and exhibits, among other things, and this evidence need not conform to

---

[6] http://www.caed.uscourts.gov/caednew/index.cfm/cmecf-e-filing/temporary-restraining-order-tro-procedures/

1  the standards that apply at summary judgment or trial.  *See Johnson v. Couturier*, 572 F.3d 1067,

2  1083 (9th Cir. 2009); *see also Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)

3  ("The trial court may give even inadmissible evidence some weight, when to do so serves the

4  purpose of preventing irreparable harm before trial").

5  **III.   ANALYSIS**

6        As an initial matter, the court disagrees with the County's argument that the plaintiffs

7  violated Local Rule 231(a).  The plaintiffs promptly gave notice to the County Counsel and sent

8  the County a copy of the court's minute order permitting a response, as instructed.  *See* Lawrence

9  Decl. ¶¶ 2–8, ECF No. 4-2; Lawrence Decl. ¶¶ 2–5, ECF No. 6.  True enough, the plaintiffs'

10  communications with the County could have been more precise.  For example, they could have

11  warned the County when they would file their motion and what hearing date they would propose.

12  They could also have chosen not to file their motion late in the evening on a Friday.  Although the

13  court expects a greater degree of professional courtesy than plaintiffs' counsel has exhibited here,

14  the court will not deny relief on this basis.  The plaintiffs' timing and vague pre-filing

15  communications did not prevent the County from filing a substantive opposition, albeit on an

16  extremely tight timeline.  The court therefore turns to the four factors described in *Winter v.*

17  *Natural Resources Defense Council*.

18        The plaintiffs' complaint and motion raise difficult legal and factual questions that cannot

19  be resolved both quickly and confidently.  The court therefore begins with the second *Winter*

20  factor: whether the plaintiffs have proven they will likely suffer irreparable harm in the absence

21  of a temporary restraining order.  *See* 555 U.S. at 20.  On the record before the court, they have

22  not done so.

23        Their arguments on this part of the *Winter* test can be divided into two categories.  A

24  looming "humanitarian crisis" is their focus in the first category.  *See* Mot. at 19; Reply at 6–7.

25  Water shortages may weigh heavily in the larger balance of equities, but in terms of irreparable

26  harm, the plaintiffs cannot succeed by citing harms to others.  They "must show that they

27  themselves are likely to suffer irreparable harm absent an injunction."  *Nat'l Wildlife Fed'n v.*

28  *Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 822 (9th Cir. 2018); *see also, e.g., Immigrant Legal*

1  *Res. Ctr. v. City of McFarland*, 827 F. App'x 749, 751 (9th Cir. 2020) (vacating preliminary

2  injunction because district court incorrectly "focused its irreparable harm analysis on the prospect

3  of harm to third parties").

4       The six plaintiffs have not carried their burden here.  Their complaint is not verified, so

5  the court turns to their declarations.  Dilevon Lo does not claim to own livestock or grow crops,

6  and he does not express concerns about difficulties finding water to meet his basic needs over the

7  next few weeks.  *See generally* Lo Decl., ECF No. 4-13.  Nor does Jerry Vang.  When officers

8  stopped him, he was carrying "dirty and unusable" water that he intended to spray on a road.

9  Jerry Vang Decl. ¶ 5; *accord* Jerry Vang Suppl. Decl., ECF No. 9-4.  Nathan Thao does not claim

10  he was deprived of water or has a pressing need to transport more water than 100 gallons in a

11  single trip.  *See generally* Nathan Thao Decl., ECF No. 4-12; Nathan Thao Suppl. Decl., ECF

12  No. 9-1.  Nor do Mao Thao and Antonio Lee.  *See generally* Mao Thao Decl. 4-10; Mao Thao

13  Suppl. Decl., ECF No. 9-3; Antonio Lee Decl., ECF No. 4-6; Suppl. Antonio Lee Decl., ECF No.

14  9-6.  Pao Lee does claim he was carrying water, but it was for his grandfather, who is not a

15  plaintiff.  *See generally* Pao Lee Decl., ECF No. 4-11; Pao Lee Suppl. Decl., ECF No. 9-9.  Pao

16  Lee was also only a few gallons above the 100-gallon limit, which suggests irreparable harm is

17  unlikely, at least not for the next few weeks; nothing in Pao Lee's declaration suggests he could

18  not temporarily satisfy his needs while complying with the County's 100-gallon limit.  *See* Pao

19  Lee Suppl. Decl. ¶¶ 6, 8.  Nor have the plaintiffs explained more broadly why they and their

20  community cannot satisfy their water needs in the short term by transporting 100 gallons or less.

21       To be clear, the court has scrutinized each declaration submitted with the plaintiffs'

22  motion and reply.  Many of these declarations do support the plaintiff's argument that the

23  County's ordinances and resolution will deprive people in the Hmong community of the water

24  they need for many basic needs.  *See* Koua Lee Decl. ¶¶ 6–9, ECF No. 9-8; Khue Cha Decl. ¶¶ 2–

25  5, ECF No. 9-10; Nhia Thai Vang Decl. ¶¶ 8, 12, ECF No. 9-5; Mai Yang Lee Decl. ¶¶ 12–13,

26  ECF No. 9-7.  These declarants are not parties, however, and as explained above, this court

27  cannot grant injunctive relief to prevent irreparable harm to third parties.

28       In the plaintiffs' second category of arguments about irreparable harms, they cite evidence

1   showing they have been stopped and charged with violations of the water truck ordinances.  *See*

2   Mot. at 20–21; Reply at 6–7.  Sheriff's deputies also have seized or impounded at least two of the

3   plaintiffs' water trucks, which resulted in hefty fees, and some of the plaintiffs have been left on

4   the side of the road, far from the nearest town.  *See* Mot at 20; *see also, e.g.*, Jerry Vang Decl.

5   ¶¶ 8–10; Dilevon Lo Decl. ¶¶ 6–13.  An injunction would not right these wrongs, which have

6   already occurred, and binding Supreme Court precedent forecloses any success based on the

7   expectation of future stops and seizures.  *See, e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95,

8   105–10 (1983) (holding that plaintiff, who alleged police officers had choked him without

9   provocation, lacked standing to seek an injunction because it would be "speculation" to infer "that

10  [he] will again be involved in one of those unfortunate instances").  The plaintiffs have not shown

11  that some specific constitutional violation is imminent or that they are caught on the horns of a

12  constitutional dilemma.  *Cf., e.g.*, *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d

13  1046, 1058–59 (9th Cir. 2009) (holding choice between obedience to unconstitutional law and

14  loss of business is irreparable harm).  They do not claim, for example, to have parked their water

15  trucks and let crops wilt in fear of impoundment.  Some past harms also appear unlikely to

16  reoccur.  Jerry Vang's truck, for example, was returned to the rental company, which suggests no

17  fines are accruing.  *See* Suppl. Vang Decl. ¶ 7, ECF No. 9-4.

18         The final two *Winter* factors—the balance of equities and the public interest—merge here

19  because the defendants are government actors.  *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d

20  1073, 1092 (9th Cir. 2014).  There are weighty public interests on both sides of the balance.  On

21  the one hand, many Hmong citizens of Siskiyou County may soon face a water shortage during

22  the hottest months of the year thanks to the ordinances of a government they have plausibly

23  characterized as poisoned by racial discrimination.  Examples of anti-Asian discrimination in

24  California are both longstanding and far too recent to ignore.  On the other hand, the County

25  denies the plaintiffs' claims of racial discrimination, and it stands by its finding that illegal

26  cannabis cultivation is an unsustainable drain on scarce groundwater resources during a drought.

27  Its interests in public health and safety also weigh against an injunction.  According to the

28  unrebutted testimony of the County's Director of Community Development, the water ordinance

10

1    targets the areas with the largest concentration of illegal cannabis cultivation and most severe

2    risks to public health and the environment.  *See* Dean Decl. ¶¶ 5–7.  The County's ordinances

3    permit water transportation by emergency vehicles and an unlimited number of other trucks as

4    long as they carry 100 gallons or less.  And if members of the Hmong community need trucked

5    water in greater quantities for legitimate purposes, the County's ordinances allow the County to

6    quickly issue permits, as it proposes to do.  *See id.* ¶ 8.

7    **IV.   CONCLUSION**

8         Because the plaintiffs have not carried their burden to show they are likely to suffer

9    irreparable harm or that a temporary restraining order would be in the public interest, **their**

10   **motion for a temporary restraining order is denied.**

11        A preliminary injunction hearing is set for **Wednesday, July 28, 2021 at 10:00 a.m.**

12   before the undersigned.  The hearing will be by videoconference.  The plaintiffs may file a brief

13   in support of their request for injunctive relief by **June 30, 2021**.  The defendants may respond by

14   **July 14, 2021**.  Any reply must be filed by **July 21, 2021**.  These dates may be continued for

15   good cause, only with this court's approval.

16        This order resolves ECF No. 4.

17        IT IS SO ORDERED.

18    DATED:  June 15, 2021.

_____
CHIEF UNITED STATES DISTRICT JUDGE