<pre>
1              IN THE UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF CALIFORNIA
2       BEFORE THE HONORABLE CHIEF JUDGE KIMBERLY J. MUELLER

3    Dilevon Lo, Jerry Vang, Nathan Thao,
     Mao Thao, Pao Lee, Antonio Lee,
4    Koua Lee, Nhia Thai Vang, Zeng Lee,
     Der Lee and Khue Cha,
5
                        Plaintiffs,
6     vs.                                 Sacramento, California
                                          No. 2:21-CV-00999-KJM
7    County of Siskiyou; Jeremiah LaRue   Friday, August 6, 2021
     and Jesus Fernandez, in their official  11:00 a.m.
8    capacities as members of the
     Siskiyou County Sheriff's Department
9    and in their individual capacities;
     and Brandon Criss, Ed Valenzuela, Michael
10   N. Kobseff, Nancy Ogren, and
     Ray A. Haupt, in their official capacities
11   as members of the Siskiyou County Board
     of Supervisors and in their individual
12   capacities; Edward Kiernan, in his official
     capacity as County Counsel for
13   Siskiyou County and in his individual
     capacity; and DOES 1-100,
14
                        Defendants.
15   _____/

16                        --oOo--

17            REPORTER'S TRANSCRIPT OF PROCEEDINGS

18      RE: PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

19         (Hearing conducted via Zoom videoconference)

20                        --oOo--

21   APPEARANCES:

22   For THE PLAINTIFFS:        Margolin & Lawrence
                                Attorneys at Law
23                              By: J. Raza Lawrence
                                    Allison Margolin
24                              8484 Wilshire Blvd., Suite 440
                                Beverly Hills, CA 90211
25
</pre>

1              **APPEARANCES CONTINUED**

2

    For **THE DEFENDANTS:**        Spinelli, Donald & Nott
3                                  Attorneys at Law
                                   By: **J. Scott Donald**
4                                  601 University Ave., Suite 225
                                   Sacramento, CA 95825
5

6   Official Reporter:            Tiphanne G. Crowe
                                   CSR No. 10958
7                                  501 I Street
                                   Sacramento, CA  95814
8                                  Tcrowe.csr@gmail.com

9   *Proceedings recorded by mechanical stenography.  Transcript
    produced by computer-aided transcription.*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      SACRAMENTO, CALIFORNIA, FRIDAY, AUGUST 6, 2021, 11:00 A.M.

2                              --oOo--

3           THE CLERK:  Calling civil case 21-999; Lo, et al., v.

4      County of Siskiyou, et al.  This is on for plaintiffs' motion

5      for preliminary injunction.

6           THE COURT:  All right.  Appearing for plaintiffs.

7           Lead counsel --

8           MR. LAWRENCE:  Good morning --

9           MS. MARGOLIN:  Morning, your Honor --

10           THE COURT:  Lead counsel.

11           MS. MARGOLIN:  Good morning, your Honor.  I am lead

12      counsel.  However, Mr. Lawrence and I have determined that when

13      the Court asks a question, he will argue first, and then I

14      will -- if the Court doesn't mind -- I'll just buttress his

15      argument afterward, just because we're not in the same

16      location.

17           Would that work for the Court?

18           THE COURT:  Have you divided up by subject area?  The

19      rule is one attorney per -- per subject area.

20           MS. MARGOLIN:  Okay.  Well, Mr. Lawrence will be doing

21      the argument then on all the subject areas, and then at the

22      end, maybe the Court could just leave me -- allow me leave to

23      argue for a few minutes.

24           But Mr. Lawrence will be answering the questions.

25           THE COURT:  All right.

1    MS. MARGOLIN:  Thank you.

2    THE COURT:  Mr. Lawrence, your appearance.

3    MR. LAWRENCE:  Yes.  Good morning, your Honor.  This

4    is attorney Raza Lawrence from the Margolin, Lawrence Law

5    Office appearing via Zoom, and I'm representing all of the

6    plaintiffs in this action.

7    THE COURT:  All right.  Good morning to you, Mr.

8    Lawrence.

9    For the County of Siskiyou.

10    MR. DONALD:  Good morning, your Honor.  This is Scott

11    Donald.  I'll be lead counsel and arguing on behalf of all of

12    the defendants, except for the California Department of Fire.

13    THE COURT:  All right.  Is Department of Fire

14    represented here this morning?

15    Mr. Spinelli, you're -- you are monitoring?

16    MR. SPINELLI:  I'm just watching, your Honor.  Thank

17    you.

18    THE COURT:  All right.

19    MR. DONALD:  Your Honor, I don't believe so.  I

20    haven't seen any evidence that they've either been served or

21    they have made any form of an appearance in this case.

22    THE COURT:  All right.  Just checking.

23    All right.  I do have several questions here, and

24    before I get to those questions, I -- I just want to make

25    certain -- it is up to the Court, fundamental to Article III is

1    neutrality and, you know, full independence.

2         And so the Court always thinks about whether or not it

3    can decide a case fully and fairly.  This Court believes it can

4    do that here, but I want to make certain that the parties know,

5    as chief judge of the court currently, I have duties in

6    addition to presiding over cases.

7         And given this Court's need for judicial resources,

8    one of those duties has been to provide information to Congress

9    about our need.  Courts don't lobby, but we do, on occasion, we

10   sometimes are asked to provide information to Congress, and

11   then we have the ability to make certain that members of

12   Congress have information.

13        So this judge testified before the Senate -- the House

14   subcommittee on Court's intellectual property and internet

15   earlier this year, and this Court has provided information to

16   members of Congress who represent parts of this district.

17        We are a very large district, 34 counties.  11 members

18   of Congress represent this district.  Congressman LaMalfa is

19   one of those.  So this Court has spoken briefly to Congressman

20   LaMalfa only about that issue of need for judicial resources

21   and provided one letter providing information.

22        Again, I have thought carefully.  In my mind, that

23   does not make me unable to decide this case fairly, but I just

24   wanted to make that disclosure so the parties are aware of it.

25   I'm not asking you to respond today, but if either party has a

1   concern, they can file something with the Court given that the

2   congressman's name is invoked in some of the filings.

3        So generally, I just want to say, I cannot say that I

4   regret -- I cannot say that the filings, the supplement

5   filings, the record before the Court, are as helpful as they

6   should be given what appears to be the significance of this

7   matter.

8        And there are -- the Court questions whether or not

9   plaintiffs, in particular, should associate counsel very

10  experienced in -- in federal preliminary injunction practice.

11       But both sides -- there's -- there's information here

12  that appears to be getting in the way of the Courts having what

13  it needs to decide this question fully and fairly.

14       And I'm going to explain that as we go forward here,

15  but one example for the plaintiffs, before I get into the

16  specific questions, this Court has rules regarding the length

17  of replies.

18       Replies are not to exceed ten pages.  A party can

19  request that a reply exceed ten pages.  Here we have a 30-page

20  reply.  Now, this Court at times has said, well, I'm not going

21  to read past the first ten pages.

22       Here I have read the reply brief because of the

23  importance of this matter based on what I can see about what

24  appear to be facts on the ground.

25       But it's not until the last ten pages of the reply

1   that plaintiffs appear to start to address the merits questions

2   that are critical to the Court's resolution of the pending

3   motion as quickly as possible given what may be at stake.

4          So I'm considering the reply, but reminding

5   plaintiffs' counsel of their obligation to follow the rules and

6   think in advance about whether or not they need to ask for an

7   exception of the rules.  I am sua sponte directing a sur-reply.

8   I'm just cutting to the chase here.

9          Given what's in the reply, I believe it is essential

10  for a fair record, for me to hear what the defendants have to

11  say, unless they tell me they are submitting on the record.

12         But particularly given the last ten pages arguing the

13  equal protection issues, in particular, my inclination is to

14  give the defendants a short period of time, up to seven days,

15  to give me a sur-reply of no more than ten pages.

16         I think it could be five pages if it just focuses on

17  the last ten pages of the reply, so --

18         MR. DONALD:  Your Honor, then I'm going to have to

19  accept that, given if that's -- that's being offered right now.

20  It doesn't appear that I -- I guess I'm puzzled by the timing

21  of the request.  I mean, the timing of your statement on that,

22  so I apologize for interrupting you.

23         THE COURT:  Well, the reply was filed August 4th.

24         MR. DONALD:  I guess that's partly my question, your

25  Honor, and I guess the point is that you obviously have a

1  question remaining that you need addressed, so I will address

2  that then in a sur-reply.

3          THE COURT:  Well, I'll -- you'll get a better sense of

4  where the Court is on all of this.  I'm not only -- I'm not

5  only directing the sur-reply to ensure the record is complete,

6  but I am -- I am -- we'll see how this hearing goes, but I'm

7  inclined to send you to mandatory settlement to focus on, what

8  could be critical issues, to the extent I can discern them from

9  this record.

10         They don't have to do with -- with water for

11  marijuana.  They have to do with Water for People.  A named

12  plaintiff.  So at least some of the named plaintiffs, it does

13  appear, are saying under oath they are not receiving sufficient

14  water for day-to-day living.

15         The Court had this concern when it saw the TRO papers,

16  but it noted at that point none of the evidence before the

17  Court related to any named plaintiff.

18         So that's why I'm expressing some concerns about how

19  the matter is, or is not, teed up.

20         At least now, it appears to the Court, there are

21  certain named plaintiffs who have under oath said they are not

22  getting enough water to bathe more than once a week.  To water

23  their non-marijuana gardens.  To water their livestock and

24  animals that they rely on for food.  So that -- that appears to

25  be in the record, and I cannot ignore it.

1          But so on the likelihood of success on the merits,

2     critical to whether or not the Court would grant a preliminary

3     injunction.  Let me just ask these questions of plaintiffs'

4     counsel:

5          The motion before the Court refers to Title VI.

6     There's no Title VI claim in the complaint.  So I can't grant

7     injunctive relief based on Title VI, right, Mr. Lawrence?

8          MR. LAWRENCE:  Yes, your Honor.

9          THE COURT:  All right.  Same with Government Code

10    Section 11135.  No claim under 11135 in the complaint.  I can't

11    grant injunctive relief based on that, correct?

12         MR. LAWRENCE:  Yes, your Honor.  I understand.

13         THE COURT:  All right.  Due process, the plaintiff --

14    this is one of two issues that starts to get developed in the

15    reply.  There's due process, and there's equal protection.

16         On due process, the complaint alleges plaintiffs are

17    deprived of property rights to water without due process.

18         The county has provided information on the process

19    that it afforded the community at large.  The -- the plaintiffs

20    say they haven't gotten due process, but I'm not seeing that

21    that issue is developed.  It's an undeveloped argument without

22    any evidence.

23         So Mr. Lawrence, is there evidence to support a

24    deprivation of due process that you can point me to?

25         MR. LAWRENCE:  Your Honor, one of the -- I think this

1   is tied into the equal protection issue, and one of the items

2   that we look at in looking at whether there's discriminatory

3   intent and due process, is whether there were departures from

4   standard procedural or substantive processes here.

5         And I think the way that this law was passed and

6   imposed, basically cutting off access to water to an entire

7   ethnic community, just by fiat, like I believe that that does

8   implicate due process concerns and there was no -- there was no

9   real assessment of the situation.

10        No ability of people to have a right to be heard

11  within the community.  But this was just a highly irregular

12  process where they are imposing burdensome rules on one

13  specific ethnic community that do not apply to anybody else,

14  and --

15        THE COURT:  So is that procedural due process, or

16  substantive due process, or both?

17        MR. LAWRENCE:  I believe it could be both.  I believe

18  in the procedures -- in the procedural due process that these

19  individual members of the community did not really have a right

20  to be heard and respond.

21        In terms of substantive due process, I think just in

22  terms of their right to live their lives in this community and

23  have access to the basic items that they need.  How that was

24  just cut off by this ordinance, I believe, could also be

25  substantive due process.

1        THE COURT:  All right.  But still, where is the

2    evidence?  Is there -- just focus on due process.  We're

3    getting to equal protection.  Is there evidence in the record

4    to support the argument the plaintiffs were deprived procedural

5    due process or that the county's actions violate substantive

6    due process?

7        MR. LAWRENCE:  Well, just in terms of procedural due

8    process, in terms of the plaintiffs who live in the community,

9    but are not themselves landowners, there's no real procedure

10   even being given to them to get -- to get water.

11       There's a procedure for certain landowners to go

12   through this permit system, but in terms of the people who

13   don't even own -- there is no procedure being afforded to them

14   to get the water, and then in terms of getting a water truck --

15       THE COURT REPORTER:  I'm sorry, Counsel --

16       THE COURT:  I think you have to slow down and speak up

17   and more clearly.

18       THE COURT REPORTER:  You were cutting in and out.

19       MR. LAWRENCE:  So first of all, this procedure that

20   they've provided through the permit system for the permits for

21   the water trucks, it appears that only landowners can follow

22   this, and there are a number of people in this community,

23   including some of the plaintiffs who are not themselves

24   landowners, but they live in the community, and they are not

25   being given any procedure to access water.

1       In addition, their ability to get these permits to get

2    the water, it's dependent on them, first, having a well owner

3    who themselves has an extraction permit for use off-site.  The

4    person who has been providing the water to the community, the

5    farmer Steve Griset, he does not have this extraction permit.

6       In fact, he's been the subject of a lawsuit by the

7    county that's been ongoing for several months about his pumping

8    the water.

9       So the majority of people in this community are --

10   there's no way for them to follow this process that's been set

11   out to access the water through the permit system.

12      So we believe that that is a due-process violation,

13   and that they're not given any procedure to get the water

14   unless the well owner has this permit, which they do not, and

15   unless they're landowners themselves.

16      THE COURT:  So when the defense says:  No plaintiff

17   has applied for a permit, your response would be:  No plaintiff

18   is eligible to apply?

19      MR. LAWRENCE:  Well, that -- that's correct.  Just

20   because the person providing the source of their water, the

21   farmer, he doesn't have the required permit, which was also

22   passed on the same day the extraction permit for use of the

23   site, so because the plaintiffs -- the person that has access

24   to the water source, doesn't have the new permit set up at the

25   same time as the requirement.

1       They really have no way to get a permit themselves, so

2  they have no way to access the water, period.  There's no

3  access for them to show that they are -- to get the water from

4  a source where they can access it --

5       THE COURT:  Well -- well, all right.  So to the extent

6  that falls within due process, let me just ask Mr. Donald, I

7  did have a question about the focus of land ownership and the

8  official residences of owners of the land.

9       Because it's -- if plaintiffs aren't owners, it

10  doesn't mean they may not have rights.

11       MR. DONALD:  Agreed, your Honor.  But the rights that

12  the folks that would be inhabiting a particular lot wouldn't

13  get a greater right than the people that own that property, and

14  if the people that own that property who would apply for a

15  permit -- and I'm just saying hypothetical, because I don't

16  agree that the record shows any form of a procedural due

17  process violation.

18       There's other ways of these people getting water, and

19  we're -- again, we're talking about agricultural water in large

20  quantities.  Not potable water.  Water delivered by water

21  trucks.

22       The property owners have a -- can't get these large

23  amounts of water without getting a permit.  There's no

24  demonstration that even the owner of the property tried to get

25  a permit.  Nobody has tried to get to a permit.

1    And it's up to the plaintiffs to establish this due

2    process concern by effectively taking an act and have a

3    colorable claim, which none of them have demonstrated at this

4    point.

5    THE COURT:  But do you dispute that the plaintiffs, or

6    at least or most of them, the plaintiffs aren't able to apply

7    themselves for a permit?

8    MR. DONALD:  We have no idea.  We have no idea.

9    There's not enough sufficient evidence that has been -- in my

10    view -- purposefully left out -- for us to know.  We don't know

11    what they can or cannot do.

12    THE COURT:  Isn't it your -- your position is that

13    most, if not all of the named plaintiffs, are not the owners of

14    the land, correct?

15    MR. DONALD:  They may or may not be.  I don't know.

16    THE COURT:  Well let's just assume for sake of

17    argument, accept what Mr. Lawrence is saying, plaintiffs aren't

18    the owners.  Under that scenario, plaintiffs could not apply

19    for a permit themselves, correct?

20    MR. DONALD:  No, your Honor.  There are several of the

21    plaintiffs, at least five of them, are owners of their

22    property.  So one would expect that one of those people would

23    have applied for a permit, and they have not.

24    THE COURT:  Mr. Lawrence, just agreed, at least five

25    plaintiffs are owners in the Mt. Shasta subdivision?  You need

1     to unmute.

2              MR. LAWRENCE:  Yes.  There are some that are owners, I

3     believe, that were highlighted in defendants' most recent

4     filing.  I believe that number is approximately five.  There

5     are some that do not appear to be property owners, but...

6              THE COURT:  So for those who are, well, the record

7     shows they've applied for a permit and been denied.

8              MR. LAWRENCE:  The record shows that some of them

9     owned some undeveloped land in the subdivision.  That doesn't

10    necessarily mean those are the plots that they reside on.  I

11    know that some people reside with friends, family, et cetera.

12             I think that this focus on the ownership issue is kind

13    of a red herring.  I think the relevant inquiry is whether

14    these are residents of this community.  Under California law,

15    "residents" are defined as people who physically reside in a

16    certain area.

17             And whether they are also property owners, I don't

18    believe that that's a prerequisite of having constitutional

19    rights that they can --

20             THE COURT REPORTER:  I'm sorry, Counsel.  You're

21    cutting in and out.

22                  (Whereupon, the reporter read back)

23             THE COURT:  Can you pick up from there, Mr. Lawrence?

24             MR. LAWRENCE:  Yes.  The point is that for these

25    constitutional considerations, I believe the inquiry should be

1   whether these are residents of this community.  It doesn't

2   matter whether they own any specific plot of land, or whether

3   the plot of land that they are currently residing on is owned

4   by -- in terms of the cultural context here, a lot of the Hmong

5   community are -- have a very communal way of living.

6           They help each other.  They support each other.  So we

7   could develop the record further with additional evidence about

8   who owns what land, but I don't believe that that's really the

9   most relevant consideration here.

10          The point is, do they live in this community, and have

11  they been afforded a reasonable process to obtain access to

12  water?

13          THE COURT:  I understand that argument.  Just so I'm

14  clear, on procedural due process, basically you are saying that

15  there's nothing in the record, except that the county has

16  provided me, for me to determine whether or not the process by

17  which the ordinances were adopted violates procedural due

18  process, correct, Mr. Lawrence?

19          MR. LAWRENCE:  Well, there was the original -- I mean,

20  these ordinances were additionally adopted on an urgency basis.

21  Essentially, not giving any right to have people respond, but I

22  believe the way these were pushed through initially on an

23  urgency basis, opportunity for consideration, that would be a

24  matter for procedural due process.

25          But just in terms of -- once the laws are passed, in

1    terms of the people's ability to apply for water from the

2    government, especially since Mr. Griset, the farmer, doesn't

3    have the required permit himself, there's no -- there's in

4    effect, no procedure for any of the people to actually act in

5    the way that --

6            THE COURT:  Yeah, you -- you're -- I understand you

7    are using procedure in one way, but I understand what you are

8    saying.

9            On overbreadth, I just want to check on this, because

10   the plaintiffs also argue the County's regulations violate

11   overbreadth.  I'm not seeing that the Supreme Court has ever

12   described the overbreadth doctrine in a way that -- that limits

13   it to First Amendment protections.

14           I don't see that the Ninth Circuit -- I mean, the

15   Supreme Court has suggested it is limited to First Amendment.

16   I don't see that the Ninth Circuit has recognized a doctrine

17   that goes beyond First Amendment.

18           And so I -- I don't see how overbreadth can support

19   the granting of injunctive relieve.

20           Mr. Lawrence, disagree with the Court's understanding

21   of Supreme Court or Ninth Circuit law on overbreadth?

22           MR. LAWRENCE:  So I understand that overbreadth is an

23   important consideration in First Amendment cases, and one of

24   our points that we've fleshed out a little bit in our most

25   recent brief is we believe that Plaintiffs, themselves, are

1   being subjected to an ongoing violation of their Fourteenth

2   Amendment rights to equal protection of the laws and First

3   Amendment rights to freedom of association given the government

4   officials' comments that they are trying to choke out the

5   community, and the various evidence that we've submitted

6   that -- suggesting that they are attempting to drive these

7   people off the land and disperse the community.

8          So I believe that is an important First Amendment

9   right, freedom of association, that's being attacked, but I

10  also believe overbreadth can be evidence of discriminatory

11  intent and purpose covering -- making life more difficult for

12  people beyond what is supposedly being targeted, which is the

13  cultivation of cannabis and certain environmental crimes.

14         That -- that if there were a regulation targeting

15  those specifically, that that would be -- perhaps pass

16  constitutional muster, but because these laws are interfering

17  with everybody's lives in this community, in a very overbroad

18  fashion, that itself is evidence of discriminatory intent and

19  purpose.

20         THE COURT:  All right.  That seems to merge the -- a

21  factual understanding of overbreadth with the legal concept,

22  and I understand the argument, but I am not seeing any

23  authority for -- for characterization of any freedom of

24  association claim.

25         So is that -- I understand factually what you are

1   saying, but it sounds like a novel argument, trying to bring

2   freedom of association --

3           MR. LAWRENCE:  And in a way, it's somewhat novel.

4   It's come up in response to some of the comments that we've

5   seen quoted in our briefs from the sheriff, from the board of

6   supervisors, from the district attorney that essentially make

7   it appear as if the county is --

8           THE COURT:  I'm asking about legal authority.  Are you

9   thinking of any -- any Supreme Court, Ninth Circuit, even

10  District Court authority that -- that blesses the way in which

11  you are characterizing freedom of association for purposes of

12  overbreadth claim.

13          MR. LAWRENCE:  Your Honor, I don't have any particular

14  case on point on that -- on that topic, but would be -- we

15  could provide additional briefing on that if the Court would

16  like.

17          THE COURT:  All right.  So then turning to equal

18  protection, and I had signaled -- it's due process and equal

19  protection -- in particular, equal protection -- that the Court

20  believes deserves the greatest focus here, and that's why I'm

21  providing for the -- the sur-reply.

22          Would you agree, Mr. Lawrence, that ultimately the

23  Court has to think about what the record shows about the

24  County's intent?

25          MR. LAWRENCE:  That's correct.  I would agree.

1    THE COURT:  There's competing information, and of

2    course plaintiff has the burden at this point.  So on the one

3    hand, my sense of the record is that there is evidence that the

4    county has submitted -- it hasn't been tested through --

5    through full discovery or trial, of course -- but suggesting

6    the focus on Mt. Shasta is -- legal marijuana cultivation in

7    that area is much more intense than in other parts of the

8    county.

9    It's increased rapidly in scale.  It's led to an

10   increase in violent crime and conflicts, including violent

11   crime against some of the Hmong residents of the Mt. Shasta

12   community.

13   So the county, in its briefing, is not painting the

14   Hmong community as -- as a montalift.  Some of the plaintiffs'

15   expert's declaration indicates that at least infrared

16   information suggests there are other areas of the county where

17   marijuana cultivation is as intense, but those areas are not

18   targeted by the ordinance, by the County's identification of

19   roads, its enforcement against traffic on certain roads that

20   lead only into the Mt. Shasta community.

21   So let me ask Mr. Donald that question.  Why is there

22   not an inference to be drawn from the exclusive focus in terms

23   of identification of roads leading into Mt. Shasta that -- that

24   does allow an inference of ill intent towards this community in

25   particular?

1    MR. DONALD:  Well, your Honor, I think the concern or

2    the question is really one of the -- the happenstance of a

3    certain group of people, perhaps, being in one area where a

4    significant amount of crime is occurring.

5    And that the focus of the statute -- the ordinances in

6    question are pretty clear.  They're to curb illegal

7    cultivas (sic) -- the illegal cultivation of cannabis.  And

8    there is nothing on the face, and two of them are countywide.

9    Only one of them is focused on the -- which is the water

10   trucks.

11   And that water truck ordinance is very specific as to

12   why, and it's because that area is -- and I believe our

13   declarations show, and even the declarations and the statements

14   that plaintiffs quote in their affidavits coming from my

15   clients, from particularly the sheriff, that that area is one

16   of extremely high concentration of marijuana growth, and

17   extremely high concentration of related problems that go along

18   with that marijuana growth.

19   Frankly this decision, which is extremely important,

20   and I understand that, there's a lot of questions about whether

21   or not the focus should be on the agricultural water and the

22   delivery and extremely large quantities of agricultural water,

23   which is what the ordinance targets, versus the intended issues

24   for the residents of Mt. Shasta Vista who are residing, from

25   all the evidence that you have at this point, in a manner that

1    is unsafe.

2            They are either relying on unpotable water for daily

3    living, which is obviously -- it's not our position that they

4    are.  Our position is all that water is intended for illegal

5    cannabis cultivation.

6            But that the water that's being regulated, not

7    prohibited, but regulated, is specific to large quantities of

8    agricultural water, and the trucks were going into that area in

9    large quantities, 100 a day.  That's the declaration.  That's

10   the evidence that's before this Court.

11           THE COURT:  So Mr. Lawrence, fundamentally -- and I

12   should acknowledge.  I didn't knowledge his presence earlier,

13   but the lead plaintiff is -- I did allow the lead plaintiff

14   into the virtual courtroom, so he's able to see and hear from

15   this vantage point.  Others I believe are monitoring the

16   hearing by phone.  It's the attorneys who are speaking for him,

17   of course.

18           So Mr. Lawrence, it's the plaintiffs' burden.  Why is

19   not a fair assessment of the record before the Court that they

20   are equally balanced competing positions and, therefore,

21   plaintiff cannot prevail?

22           MR. LAWRENCE:  Your Honor, I believe the appropriate

23   legal inquiry is set out in the *Mhany Management v. City of*

24   *Nassau* case from the Second Circuit that we quoted from in our

25   most recent brief.  And that case itself applies factors from

1    the Supreme Court case, *Village of Arlington Heights v. Metro*

2    *Housing Development, Corp.*

3           Both of those cases dealt with issues of fair housing

4    and also the equal protection clause, and they both dealt with

5    the particular issue of how to infer discriminatory intent when

6    it's rarely susceptible to direct proof.

7           Usually the government officials are not explicitly

8    saying that they are passing it for racist reasons, but it

9    deals with the disparate impact issue, and then how do you tell

10   whether that's being driven by discriminatory intent versus

11   lawful reasons.

12          And the first factor to look at is whether the

13   official action bears more heavily on one race than another.  I

14   feel like this is almost undisputed.  We've shown that they've

15   cut off water into -- the only way into this Hmong community

16   through rules that don't apply to anyone else in the state.

17          I don't think that the defendants have really disputed

18   this, so I think that we have the disparate impact, and then if

19   you shift to looking at the intent.  The courts say you look at

20   the historical background of the situation.  How this community

21   has been treated.  I think we have a long track record of

22   discrimination against the Hmong people, specifically in

23   Siskiyou County.

24          And also whether there's departures from the normal

25   procedural sequence or substantive departures.  I think here

1    the way they've cut off water to the entire community through

2    this ordinance, I think it's highly unusual.

3              And then the legislative or administrative history and

4    contemporary statements by the officials.  I think here we've

5    pointed to, specifically statements from Sheriff LaRue, where

6    he's essentially saying everybody who lives in this community,

7    his most recent comment was all 6,000 of them, they are all

8    growing cannabis.

9              That they are all criminals, and during the -- when

10   this -- the restrictions were passed, he spoke, Sheriff LaRue,

11   at the board of superviors' meeting and he says, basically, we

12   need to choke them out.  We need to go after everybody here.

13   Not just the growers, he said, but essentially everybody in the

14   community.

15             And we have Supervisor Haupt recently claiming that

16   this is all part of a criminal cartel.  So I think the way the

17   local officials are essentially painting everybody who lives in

18   this community, thousands of them, as criminals when the

19   evidence is some of them are growing cannabis illegally, some

20   are not.

21             But the way that the officials have spoken about this

22   community, the way that they have targeted them specifically

23   with these laws, I think they all point to discriminatory

24   intent.

25             Just -- the other factor about discriminatory intent,

1    just the fact that the government has tried to actually enforce

2    the cannabis criminal laws, the environmental criminal laws,

3    that they can actually enforce (Zoom drop) at issue.  Rather

4    than doing that in a targeted way, they've gone after this

5    entire community trying to choke them out.

6         That goes to the overbreadth issue again, but I think

7    that that also points to discriminatory intent, but I think if

8    you look at each of the factors in *Arlington Heights*, um,

9    opinion, they all point to a finding of discrimination even

10   though -- even if there may not be a particular quote saying

11   that they are doing this for discriminatory reasons.

12        THE COURT:  Let me just ask Mr. Lawrence in follow-up,

13   and then to the extent the evidence is in equipoise, plaintiffs

14   don't meet their burden, but I don't see -- apart from the

15   expert's declaration, and the reference to other areas where

16   there are dense marijuana grows, I don't see evidence from the

17   plaintiffs showing that crime, conflicts, public health

18   problems, permitting problems, other environmental problems are

19   comparable in other areas of the county, as compared to Mt.

20   Shasta, and whether or not illegal marijuana grows and impact

21   on water supply, ground water supply, is equal or greater in

22   other parts of the county.

23        Is there evidence beside a portion of -- is it Mr.

24   Szendrey's declaration -- that suggests that, but doesn't

25   develop it?

1          MR. LAWRENCE:  Well, I believe the strongest evidence

2     is the sheriff's own report, the 2021 strategic report, where

3     they lay out specific regions in the county that are having

4     these alleged cannabis cultivations and environmental problems,

5     and they identify specifically the regions where these problems

6     are taking place.

7          Also, I think just the lack of the evidence that the

8     government's actually prosecuted anyone within the Shasta Vista

9     community for any environmental crimes, when there are a host

10    of them that could be charged, I don't seen any evidence that

11    these environmental problems actually do exist in Mt. Shasta

12    Vista more concentrated than they do anywhere else in the

13    county.

14         THE COURT:  All right.  Then here -- here is -- I

15    am -- I mean you can object, but my very strong intention,

16    unless I hear something in the next few minutes, is to send you

17    to mandatory settlement by early next week.

18         I have identified experienced competent mediators.

19    The Ninth Circuit has a crew of very qualified mediators, and

20    I've spoken to the lead mediator.  Someone can be available

21    early next week.

22         I'm going to send you to mandatory settlement to

23    answer some focused questions while I wait for the defendants'

24    sur-reply on -- in response to what's in the reply,

25    particularly on equal protection, can also address due process

1    if the defendants want to.

2            But the question is:  Is there not the ability to see

3    if there is a settlement that could be achieved allowing the

4    Hmong community to import limited amounts of potable water?

5    Not for growing marijuana.  Not in quantities linked clearly to

6    growing marijuana, but to meet basic needs.

7            The basic needs identified in the declarations, the

8    supplemental declarations, and what does that look like?

9    There's one declaration that says the plaintiffs proposed using

10   fire houses as water sources for certain quantities of water

11   and heard nothing in response.

12           MR. DONALD:  Your Honor, can I address --

13           THE COURT:  Well, let me finish --

14           MR. DONALD:  All right.

15           THE COURT:  I'll call on you in just a moment.

16           But that's the Court's plan, because I cannot

17   ignore -- I cannot say there's no equal protection claim there

18   that can undergird the granting of a preliminary motion, as I

19   sit here now, and in the meantime, I cannot let more time pass,

20   given what some of the declarations say.

21           So that's the Court's plan.  Mr. Donald, and then --

22   I've heard a lot from you, Mr. Lawrence, because I've had a lot

23   of questions for you, but Mr. Donald and then Mr. Lawrence

24   could wrap up.

25           MR. DONALD:  All right.  Thank you, your Honor.  First

1   of all I'd like to address the Court's express concern

2   regarding mediation.  I want to make sure that I understand

3   what the Court's asking for here, because the ordinance doesn't

4   address potable water.

5          This isn't about bringing potable water in.  There are

6   certain types of trucks that deliver potable water, and those

7   aren't at issue.  If the plaintiffs wanted to bring potable

8   water into the MSV, the area in question, they can do that now.

9          That's not the issue.  The issue is agricultural water

10  drawn from wells.  It's not potable.  It's intended only for

11  agricultural purposes.  So if we're talking about potable

12  water, I don't think we're on the same page as to what this

13  case is about.  This case isn't about that.

14         THE COURT:  Well, there is a dispute.  Some of the

15  plaintiffs are construing their declarations fairly.  They are

16  saying they are not getting potable water.  I realize we

17  disagree.  This is where a mediator might cut through on an

18  expedited basis what's really going on.

19         Ultimately, if -- if it's clear the plaintiffs have

20  access, and through their own fault, they are not getting

21  potable water, so be it.  I'm not here to be the settlement

22  judge.  I'm just telling you, I have supplemental declarations

23  from named plaintiffs saying they aren't getting potable

24  water.

25         MR. DONALD:  And I understand that, your Honor.  But I

1   also understand that we're here today to hear a motion for

2   preliminary injunction following a TRO related to three statues

3   that's been before this Court and has been briefed numerous

4   times now by plaintiffs, twice by me, and in all of those

5   instances, they have focused on an ordinance, 2108, that speaks

6   to water trucks pumping agricultural water.  There's nothing

7   about -- that's a specific narrowly tailored statute.

8   It doesn't deal with all forms of water delivery.

9           So from a standpoint of a settlement, I think it's

10  premature at this point, because what's before the Court right

11  now is a fairly straightforward ordinance that addresses ag

12  water.  It doesn't address potable water.

13          Plaintiffs may take the position that they can't get

14  potable water, but it's not based on those ordinances, and they

15  have to -- their burden of proof -- they have the burden of

16  proof.  They have to show why an ag ordinance that limits 100

17  gallons or more, somehow keeps them from getting drinking

18  water.  They haven't done that.

19          THE COURT:  And that's what you may put in your

20  sur-reply.  And I -- if you may have noticed, Mr. Lawrence has

21  gotten most of the questions here today.

22          MR. DONALD:  Thank you.

23          THE COURT:  I have pointed to the burdens.  I'm not

24  telegraphing how I'm going to resolve the preliminary

25  injunction motion.  I've narrowed the possible grounds.  It's

1    due process or equal protection.  I've told you equal

2    protection has the most heft to it based on what I can

3    currently see.

4            I'm just saying I can't sit by while I give you the

5    fair chance to further clarify your position.  I understand

6    that position.  Put it in writing.  I think -- I think some

7    focused, very focused, not a whole case, very focused

8    mediation, a trained mediator who knows how to cut to the

9    chase, makes sense.  In case there is some humanitarian,

10   inadvertent humanitarian --

11           MR. DONALD:  Consequence.  I understand that, your

12   Honor.

13           THE COURT:  Yes.  Yes, all right.  Mr. Lawrence, any

14   final word?

15           MR. LAWRENCE:  Yes, just briefly.  Just in response to

16   counsel's last comment.  I don't believe ordinance

17   distinguishes between potable or non-potable water.  A water

18   truck is defined as -- as banning a transportation of water

19   over 100 gallons.  It doesn't just apply to non-potable.

20           The other point is even if they do get non-potable

21   water from these trucks, you could boil it to drink it, which I

22   believe that many do, and also it can be used for their

23   gardens, for their animals, bathing and cleaning.  The regular

24   daily use needs for water.

25           In terms of the mediation, I believe that that would

1    be helpful.  There's been -- community members have reached out

2    to government officials over the past few weeks trying to sit

3    down and negotiate something, so far without success.  But I

4    believe if the Court directs the parties to mediation, that

5    that would be good for everybody involved to see if we can

6    potentially resolve this.

7         THE COURT:  All right.  That's what I'm going to do.

8    You'll see a docket entry this afternoon directing you to

9    mediation with an identified mediator, and then the defense has

10   seven days -- up to seven days to provide a sur-reply, ten

11   pages max, given the new arguments in the reply, and then the

12   matter is submitted.  All right.  Thank you very much.

13        MR. DONALD:  Thank you.

14        THE COURT:  You may sign off.

15        MR. LAWRENCE:  Thank you.

16        THE CLERK:  Court is in recess.

17        (The proceedings adjourned at 11:46 a.m.)

18                         --oOo--

19   I certify that the foregoing is a correct transcript from the

20   record of proceedings in the above-entitled matter.

21                         /s/ Tiphanne G. Crowe

22                         _____
                          TIPHANNE G. CROWE
23                        CSR No. 10958

24

25