1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    Dilevon Lo, et al.,                          No. 2:21-cv-00999-KJM-DMC

12                        Plaintiffs,              ORDER

13           v.

14    County of Siskiyou, et al.,

15                        Defendants.

16

17           A California county has passed a pair of ordinances which have the practical effect of

18    cutting off the water supply to a minority community that has recently been the target of racial

19    prejudice.  The plaintiffs, who are members of this community, have raised serious questions

20    about the merits of their claim that the ordinances are motivated by racial animus.  They have also

21    shown that without an injunction, they will not have water to meet their basic needs.  Because the

22    hardships tip sharply in favor of temporary relief, their motion for a preliminary injunction is

23    **granted in part**, as described below.

24    I.      BACKGROUND

25           Siskiyou County occupies some of California's northernmost territory along the state's

26    border with Oregon.  It is one of the largest counties in California by land area, and it is mostly

27    rural and undeveloped.  *See* Suppl. LaRue Decl. Ex. A at 5, ECF No. 41-1.  Mount Shasta rises to

28    more than 14,000 feet above sea level within the County's borders, and more than half of the

                                                  1

1 County's land holds national forests and wilderness areas, including the Shasta-Trinity National

2 Forest and the Trinity Alps Wilderness. *Id.* The landscape is often rugged, inaccessible, and

3 remote. *See id.*

4   These conditions have contributed to people growing marijuana illegally in Siskiyou

5 County for some time, including on public lands. *See generally id.* In 2015, the County passed

6 an ordinance banning commercial cannabis cultivation, and it stepped up its enforcement efforts

7 against marijuana growers. LaRue Decl. ¶ 3, ECF No. 31-2.[1] These efforts seem to have

8 succeeded only in shifting marijuana cultivation away from public lands, out of the open air, and

9 into greenhouses and hoop houses that have increasingly sprung up on private land. *Id.* In

10 Siskiyou County, it is also possible to grow much more marijuana in a greenhouse than out in the

11 open. *See* Suppl. LaRue Decl. Ex. A at 1–2; LaRue Decl. ¶ 3. Growers can plant and harvest two

12 crops every year, in the Spring and Fall. *See* Suppl. LaRue Decl. Ex. A at 1–2. Yields are twice

13 or three times as high. LaRue Decl. ¶ 3.

14   Criminal liability has been an ineffective deterrent to commercial cannabis cultivation.

15 Cultivation alone is a misdemeanor offense, and sentences are commonly low unless a person has

16 also violated regulations or laws enforced by Fish and Wildlife authorities or the California Water

17 Board. *See* Suppl. LaRue Decl. Ex. A at 8. For many, the potential rewards of commercial

18 cannabis cultivation seem to outweigh the risks, at least in the County Sheriff's Office's

19 assessment. *See id.* at 6.

20   The proliferation of illegal marijuana cultivation in greenhouses spurred the County's

21 Board of Supervisors to declare a state of emergency in 2018. LaRue Decl. ¶ 4; Suppl. LaRue

22 Decl. Ex. A at 4. The Sheriff's Office began issuing search warrants and seizing illegally

23 cultivated cannabis. LaRue Decl. ¶ 5. It obtained and executed almost 150 warrants a year. *Id.*

24 Over the last few years, it has seized and destroyed hundreds of thousands of illegally cultivated

---

[1] California laws that permit marijuana use and distribution do not preempt the authority of California cities and counties to restrict or completely prohibit the same conduct. *See* Cal. Bus. & Prof. Code § 26200(a); *see also, e.g.*, *City of Riverside v. Inland Empire Patients Health & Wellness Ctr., Inc.*, 56 Cal. 4th 729, 762 (2013); *City of Vallejo v. NCORP4, Inc.*, 15 Cal. App. 5th 1078, 1081 (2017).

1   marijuana plants and dozens of tons of processed marijuana worth nearly half a billion dollars.

2   LaRue Decl. Ex. C; Suppl. LaRue Decl. Ex. A at 4, 7.  Millions of dollars in currency and dozens

3   of firearms have also been seized, and the County has made more than 200 arrests.  *See* LaRue

4   Decl. Ex. C.  Two Sheriff's Deputies devote all of their time to investigating illegal marijuana

5   grow operations.  Suppl. LaRue Decl. Ex. A at 1.  One Deputy splits time between investigations

6   on private and public land, and the other focuses on private land only.  *Id.*  Three part-time

7   Reserve Deputies also assist when they are available, but the Sheriff's Office does not have any

8   other staff to assign to this enforcement effort.  *See id.* at 6, 9.  Other deputies and jail staff can

9   volunteer, but then they must work, and be paid, overtime.  *See id.* at 9.

10          The County's enforcement efforts have proven costly.  In 2020 alone, the Sheriff's Office

11   spent more than $120,000 on helicopter flights, a utility vehicle, overtime expenses, protective

12   equipment, GPS units, chainsaws, cutters, and other gear—all of it investigating and stopping

13   illegal marijuana cultivation.  *Id.* at 4.  Its budget for 2021 is $130,000.  *See id.* at 10–11.  To

14   cover these costs, the County has secured funding from a domestic cannabis suppression and

15   eradication program at the U.S. Drug Enforcement Administration.  *See generally id.*; *see also*

16   U.S. Drug Enf. Admin., Domestic Cannabis Suppression / Eradication Program (visited Sept. 2,

17   2021).[2]

18          Despite these enforcement efforts, the illegal cultivation of marijuana in greenhouses on

19   private land has increased rapidly.  *See* LaRue Decl. ¶ 6 & Ex. A; Suppl. LaRue Decl. Ex. A at 1.

20   According to a 2020 report, the Sheriff's Office had eradicated only about 10 percent of the

21   cultivation sites within the County's borders.  Suppl. LaRue Decl. Ex. A at 5.  Thousands more

22   grow sites remained.  *See id.*

23          Although cannabis is cultivated illegally in many places in Siskiyou County, *see, e.g.*,

24   Conrad Decl. ¶¶ 6–9 & Ex. B, ECF No. 22, grow operations are highly concentrated in a few

25   specific regions, *see* Suppl. LaRue Decl. ¶ 6 & Ex. A at 5–6.  One of these regions is in the

26   northeast area of the County, off County Road A12 between Big Springs Road and Highway 97,

27   an area known as the "Mount Shasta Vista Subdivision" or just "Shasta Vista."  *See* First

_____

[2] https://www.dea.gov/operations/eradication-program

1    Szendrey Decl. ¶¶ 33–35, ECF No. 4-5.  The number of cannabis greenhouses in Shasta Vista is

2    much greater than in other parts of the County.  LaRue Decl. ¶ 6.  According to the Sheriff, it is

3    the most "expansive, excessive, extreme, and impactful" concentration of illegal cannabis

4    cultivation within the County's borders.  Suppl. LaRue Decl. ¶ 6.

5         The court pauses briefly here to resolve a dispute on this point: the plaintiffs and amici

6    dispute the County's claim that illegal marijuana cultivation is heaviest in Shasta Vista, relying

7    primarily on a brief statement in the 2020 Sheriff's Office report cited above.  *See, e.g.*, Mot. at

8    15–16, ECF No. 4; First Szendrey Decl. Ex. C; Amicus Br. at 5–6 & n.8, ECF No. 42-1.  The

9    report shows two aerial photos of greenhouses in Shasta Vista.  *See* Suppl. LaRue Decl. Ex. A at

10   3–4.  It introduces the photos as depicting "a 600-acre parcel that has been divided into at least 80

11   cultivation sites."  *Id.* at 3.  The plaintiffs and amici interpret this phrase as a description of the

12   whole Shasta Vista subdivision as a "600-acre parcel."  *See* Mot. at 15–16; Amicus Br. at 5–6 &

13   n.8.  If this interpretation is correct, then only a tiny fraction of the thousands of cultivation sites

14   in Siskiyou County are within Shasta Vista.  *See* Amicus Br. at 6 n.8.  The court itself read the

15   report similarly in a previous order.  *See* Prev. Order at 4, ECF No. 11.  According to the next

16   sentence in the report, however, "it is safe to say that almost every surrounding parcel is being

17   used for the sole purpose of cultivating hundreds if not thousands of marijuana plants."  Suppl.

18   LaRue Decl. Ex. A at 3.  That claim suggests the 600-acre parcel is one of many within Shasta

19   Vista; that is, just one parcel within Shasta Vista contains 80 "cultivation sites," and the

20   surrounding parcels within Shasta Vista contain many more.  The Sheriff reads the report this

21   way, *see* Suppl. LaRue Decl. ¶ 8, and he has extensive first-hand knowledge of marijuana

22   cultivation in Shasta Vista, *see* LaRue Decl. ¶ 2.  The plaintiffs and amici do not offer a reason to

23   doubt his interpretation of his Office's own report.  The court therefore adopts it in this order.

24        Greenhouse cannabis growers in Shasta Vista rely primarily on water trucks to supply

25   their crops.  *See id.* ¶ 7.  They transport water from nearby agricultural wells.  *See id.*  At the

26   height of the cultivation boom, more than 100 trucks drove into Shasta Vista every day, each

27   carrying between 2,500 and 4,000 gallons of water.  *Id.*  According to the Sheriff, more than 30

28   wells in adjacent farmland ran dry as a result of excessive groundwater pumping.  *Id.*  That may

1   not be so, however.  A local well driller blames poor well design and natural droughts.  *See* Enloe

2   Decl. ¶¶ 9, 15–16, ECF No. 4-4.  Public perception in the County among those expressing their

3   views, however, apparently was unmistakable: overuse was the true cause.  At a Board of

4   Supervisors Meeting a few months ago, the Sheriff testified that residents were "screaming"

5   about overuse "nonstop."  Testimony of Sheriff Jeremiah LaRue to the Siskiyou Cty. Bd. of

6   Supervisors at 8:224–25 (May 4, 2021), Lawrence Decl. Ex. O-2, ECF No. 4-2.

7        Methods of illegal cannabis cultivation in Shasta Vista also are dangerous and

8   environmentally damaging.  *See* LaRue Decl. ¶¶ 8–10.  Growers use unregulated insecticides,

9   pesticides, and fertilizers.  *Id.* ¶ 8; Suppl. LaRue Decl. Ex. A at 15.  Chemicals and raw sewage

10  are discharged onto the land.  LaRue Decl. ¶ 9 & Ex. B;[3] Dean Decl. ¶ 7, ECF No. 8-1.  Trash

11  litters the ground.  Dean Decl. ¶ 7.  People have died in unpermitted structures after suffering

12  carbon monoxide poisoning.  LaRue Decl. ¶ 10.

13       Violent crime in Shasta Vista has also spiked in recent years.  *Id.* ¶ 11.  The Sheriff's

14  Office has responded to reports of armed robbery, assault, and murder.  *Id.*  In just one recent

15  week, a man was pistol-whipped and robbed, another was the target of gunshots fired by a

16  neighbor, and six people were bound and robbed by gunmen wielding AK-47s.  *Id.* ¶¶ 13–14.

17  Few similar crimes were reported in Shasta Vista before illegal cannabis cultivation took hold.

18  *See id.* & Ex. C.

19       Not long after marijuana cultivation began rising in Shasta Vista, many Hmong migrants

20  began moving to the area from elsewhere in the United States.  *See* LaRue Decl. ¶ 3 (reporting

21  that marijuana cultivation in Shasta Vista began to increase "a few years before 2015"); Suppl.

22  Der Lee Decl. ¶ 6, ECF No. 33-2 (recalling that Hmong migrants began arriving in Siskiyou

23  County in about 2015).  Shasta Vista is now predominantly Hmong.  First Szendrey Decl. ¶ 11;

24  Vamntxawg Lee Decl. ¶ 2–3, ECF No. 4-14.  About one thousand Hmong migrants live in Shasta

25  Vista itself, and about three thousand more members of the Hmong community live nearby.  *See*

26  Vamntxawg Lee Decl. ¶ 3.

---

[3] The plaintiffs contend that some of the pictures in Exhibit B are not of the Mount Shasta
Vista subdivision.  *See* Fourth Szendrey Decl. ¶¶ 4–5, ECF No. 33-3.

Many of the Hmong people who have moved into Shasta Vista do not speak English as their first language, and the language barrier has prevented them from communicating with the locals, who for the most part speak only English.  Suppl. Der Lee Decl. ¶ 6.  They did not understand how to establish a residence legally.  *Id.*  Many Hmong immigrants also harbored suspicions of government born of persecution at the hands of communist authorities in Laos.  *Id.* ¶ 7.  Many of the County's other residents have prejudged Hmong people as outlaws, spread false rumors, brandished weapons at them, shot at their cars, stolen their belongings, told them to "go back where they came from," and even advocated arson and vigilantism.  *See* King Decl. ¶¶ 8–10, 14, ECF No. 4-15; Koua Lee Decl. ¶ 11, ECF No. 9-8; Khue Cha Decl. ¶ 7, ECF No. 9-10.

In these circumstances, many Hmong families have not obtained necessary permits and approvals from the County before building their homes in Shasta Vista.  About 1,600 parcels comprise the Mount Shasta Vista Subdivision, Dean Decl. ¶ 2, and Hmong families occupy most of those lots, Vamntxawg Lee Decl. ¶ 3, but according to the County's records, only 85 lots have been properly developed with an approved single-family dwelling, Dean Decl. ¶ 2.  Some of the remaining parcels have been developed into roads and other miscellaneous uses, but the vast majority are recorded as unimproved, undeveloped land.  *See id.*

Tensions have also prevented the County from updating its records.  Since 2017 or 2018, the County's Assessor-Recorder's office has not sent its staff to the Mount Shasta Vista out of fear for their safety.  Kay Decl. ¶ 11, ECF No. 31-3.  People block roads and confront inspectors. *Id.*  As a result, the County does not know whether many of the structures or homes in the Mount Shasta Vista area comply with building codes, zoning rules, and other laws.  *See, e.g.*, *id.*  Nor has the County been in a position to enforce rules that limit the time a person can stay on a lot without legally establishing a residence.  Dean Decl. ¶¶ 6, 9.

Water is another problem.  The County requires all single-family houses to have a permanent source of potable water.  *Id.* ¶ 3.  Wells could perhaps provide a permanent water source within Shasta Vista, but there are very few, as it is difficult to drill through the volcanic rock beneath the local ground.  *See* Griset Decl. ¶ 9, ECF No. 9-11.  According to conventional wisdom, the water beneath the rock is also salty.  *See, e.g.*, Nhia Thai Vang Decl. ¶ 8, ECF No. 9-

5.  The County has placed a moratorium on new wells.  *See* Griset Decl. ¶ 8.  Shasta Vista

residents have thus relied on water delivered by truck from one or two wells on nearby farms,

namely the same water and the same trucks used to irrigate illegal cannabis.  *See* First Szendrey

Decl. ¶ 12; Vamntxawg Lee Decl. ¶¶ 4–5; Griset Decl. ¶¶ 1–3.  The wells are agricultural and do

not produce potable water.  *See* Dean Decl. ¶ 5; Suppl. Dean Decl. ¶ 2, ECF No. 41-4.

Agricultural water is not tested or treated for contaminants.  Suppl. Dean Decl. ¶ 3.  Nor are the

water trucks commonly used in Shasta Vista approved to carry potable water.  Dean Decl. ¶ 5.

In the summer of 2020, the County's Board of Supervisors responded to the explosion of

illegal cannabis cultivation in greenhouses by passing an ordinance that bans the use of

groundwater for illegal cannabis cultivation.  *See generally* Siskiyou Cty. Ord. No. 20-13 (Aug. 4,

2020), Suppl. Donald Decl. Ex. A, ECF No. 41-2.  The ordinance emphasizes the importance of

groundwater "for domestic, municipal, agricultural, and industrial uses," for the environment, and

for the plants and animals that have made the County a tourist destination.  *See id.* § 1.E–F.

"Cannabis is a water-intensive crop," the Board found, and despite prohibitions on commercial

cannabis cultivation, Sheriff's Deputies were seizing thousands of illicit cannabis plants and

thousands of pounds of processed cannabis.  *Id.* § 1.L–M.  Water trucks were also delivering

"large quantities of groundwater" from local wells to illegal cannabis cultivation sites, most

"without legally established residences." *Id.* § 1.N.  This was untenable, especially because some

parts of the County were in an extreme drought.  *See generally id.*; *see also* Haupt Decl. ¶ 2.a,

ECF No. 41-5.  The Board thus added three prohibitions to the County's municipal code:

> (a) No person or entity shall engage in the act of wasting or unreasonably using groundwater by extracting and discharging groundwater underlying Siskiyou County for use in cultivating cannabis in violation of Chapter 14 or Chapter 15 of Title 10 of the Siskiyou County Code.

> (b) No person or entity shall permit the existence of any public nuisances, as defined in this Article, to exist on property in his or her ownership or possession and control.

/////

7

1        (c) No person shall knowingly use water extracted in violation of this
2        section.

3   Ord. No. 20-13 § 3 (amending Siskiyou County Code § 3-13-702).  The ordinance was adopted

4   by the ordinary process and after public hearings.  *See* Kiernan Decl. ¶¶ 5, 9, ECF No. 41-3.  By

5   its terms, it applies throughout the County's borders, including in Shasta Vista.

6       Several months later, this ordinance seemed not to have achieved the Board's purposes.

7   The County's officers were still seeing large numbers of water truck deliveries to suspected

8   illegal cannabis operations.  *See* Siskiyou Cty. Ord. No. 21-07 § 1 (May 4, 2021), Suppl. Donald

9   Decl. Ex. B, ECF No. 41-2; Siskiyou Cty. Ord. No. 21-08 § 1 (May 4, 2021), Suppl. Donald

10   Decl. Ex. C, ECF No. 41-2.  The Sheriff had also estimated that millions more gallons of

11   groundwater were being used to grow cannabis, *see, e.g.*, Ord. No. 21-07 § 1.Q, and constituents

12   were still complaining of land use violations and well problems, *id.* § 1.N.

13       The Board of Supervisors thus passed two more ordinances in May 2021, again using its

14   usual process, after public hearings.  *See* Kiernan Decl. ¶¶ 5, 9.  The May ordinances created

15   permit requirements.  The permits fall into two categories.

16       First, a permit is "required in all instances in which groundwater is extracted and

17   transported off the parcel from which it was extracted, including occasions in which groundwater

18   is extracted, transported off-parcel, and returns to the parcel from which it was extracted."  Ord.

19   No. 21-07 § 3 (amending Siskiyou Cty. Code § 3.5-13.102).  With a few exceptions, including

20   emergency services uses, both water suppliers and water users must obtain permits:

21        It shall be unlawful to extract groundwater of any nature or
22        description, or for a property owner to allow such extraction on his
23        or her land, or for any person to cause, permit, aid, abet, suffer, or
24        furnish equipment or labor for such extraction, for the purpose of
25        using the water or selling the water for use on other than the parcel
26        of land upon which the extraction occurs, or contiguous parcels of
27        land under the same ownership as the parcel from which the
28        extraction occurs, without first obtaining an administrative permit as
29        provided in this chapter.

30        It shall be unlawful to use water extracted in violation of this section
31        on other than the parcel of land upon which the extraction occurs, or
32        contiguous parcels of land under the same ownership as the parcel

1         from which the extraction occurs, or for a property owner to allow
2         such use on their land, or for any person to cause, permit, aid, abet,
3         suffer, or furnish equipment or labor for such use, without first
4         obtaining an administrative permit as provided in this Article.

5 *Id.* These provisions apply throughout the County's borders, including in Shasta Vista. *See id.*

6        To apply for a water extraction permit, a person must submit an application to the

7 Environmental Health Division of the County's Community Development Department. *Id.*

8 (amending Siskiyou Cty. Code § 3.5-13.103). Other departments must then review the

9 application as well, including the Agricultural Commissioner and the Planning Director. *Id.* The

10 Community Development Director or a designee reviews the application and any comments by

11 "the affected county departments" and may require an inspection. *Id.* Permits may be issued

12 only "incidental to a lawful activity." *Id.* (amending Siskiyou Cty. Code § 3.5-13.104). They

13 cannot be issued for any uses not "allowed by the underlying zoning designation." *Id.* The

14 Community Development Director or designee may also withhold permits "until the property or

15 properties are found to be in complete compliance with any and all applicable County Code

16 sections." *Id.* Permits are good for one year and may be renewed. *Id.* (amending Siskiyou

17 County Code § 3.5-13.107). Violations are punishable as a public nuisance and may be "abated

18 through any available remedy" under federal, state, or local law. *Id.* (amending Siskiyou County

19 Code § 3.5-13.108).

20        The second permit is for transporting water transportation in a "water truck." Ord.

21 No. 21-08 § 3 (amending Siskiyou County Code § 3-4.1501(b)). A "water truck" is defined as "a

22 vehicle designed or being used to carry water of not less than 100 gallons or any vehicle designed

23 or carrying or towing tanks or bladders of 100 gallons of water or more or a 'Water Tender

24 Vehicle,' as defined in California Vehicle Code section 676.5." *Id.* (amending Siskiyou Cty.

25 Code § 3-4.105(a)). Section 676.5, in turn, defines a "water tender vehicle" as "a vehicle

26 designed to carry not less than 1,500 gallons of water and used primarily for transporting and

27 delivering water to be applied by other vehicles or pumping equipment at fire emergency zones."

28 Cal. Veh. Code § 676.5. The ordinance does not draw distinctions between full water trucks or

29 empty water trucks, or between water trucks carrying potable or unpotable water, but it does

9

1    make exceptions for emergency vehicles.  *See generally* Ord. No. 21-08 § 3.  The Director of

2    Public Works is authorized to issue water truck permits "at his or her discretion, upon application

3    in writing, and if good cause exists."  Ord. No. 21-08 § 3 (amending Siskiyou Cty. Code § 3-

4    4.1504).

5             Unlike water extraction permits, water transportation permits are not necessary in all parts

6    of Siskiyou County.  A permit is necessary only on the streets and highways the Board of

7    Supervisors specifies by resolution.  *Id.* (amending Siskiyou County Code § 3-4.1501(b)).  The

8    Board of Supervisors specified several roads on the same day it passed the permit ordinances.

9    *See* Lawrence Decl. Ex. D, ECF No. 4-2.  These roads include the only access points to Shasta

10   Vista and are concentrated in the area around Shasta Vista where many Hmong immigrants live.

11   First Szendrey Decl. ¶¶ 32–36.  As a result, water truck permits are required in and around Shasta

12   Vista, but nowhere else.

13            The County and its officers have described several goals of the three ordinances above.  In

14   a declaration submitted in this litigation, the Chairman of the County's Board of Supervisors

15   describes six:

16        • Preserving groundwater, Haupt Decl. ¶ 2.a;

17        • Preventing unlawful cannabis cultivation, *id.* ¶ 2.b;

18        • Reducing violent crime associated with illegal cannabis cultivation, *see id.* ¶ 2.c;

19        • Reducing environmental harms associated with illegal cannabis cultivation, *see id.*;

20        • Preserving limited law enforcement resources, *see id.* ¶ 2.d; and

21        • Enforcing protections against unpermitted dwellings and structures, unsanitary

22           water use, unapproved distribution of electricity, and inadequate fire protection, *id.*

23           ¶ 2.e.

24   By contrast, the County's District Attorney told *The Sacramento Bee* that the ordinances were

25   "not designed to protect the aquifer, or the ground water" but rather "to enforce California's and

26   Siskiyou's cannabis laws."  Xavier Mascareñas, "Asian Pot Growers Face Sheriff Raids,

27   Bulldozers in Northern California," *The Sacramento Bee* (May 26, 2021), Lawrence Decl. Ex. M,

28   ECF No. 4-2.  The Sheriff has also focused on rooting out marijuana cultivation.  *See* Testimony

1    of Sheriff Jeremiah LaRue to the Siskiyou Cty. Bd. of Supervisors at 8 (May 4, 2021), Lawrence

2    Decl. Ex. O-2, ECF No. 4-2.

3         The County and its officers disavow any intent to discriminate against anyone on the basis

4    of their race. *See, e.g.*, LaRue Decl. ¶¶ 3–5; Haupt Decl. ¶ 3. The ordinances' effects, however,

5    have been especially damaging to the Hmong community in Shasta Vista. Many of these people

6    have not obtained permits to extract or transport water, and for several reasons, permits are likely

7    beyond their reach. The County entertains applications for water extraction permits on a four-

8    page English-only form. *See* Second Szendrey Decl. ¶ 12 & Ex., ECF No. 9-12.[4] Among other

9    things, the applicant must identify where water will be extracted and to which parcel it will be

10   delivered. *See id.* at 12. The application requires a property owner's name and the property's

11   address, its assessor parcel number (usually abbreviated APN), and its zoning category. *See id.*

12   Applicants must also identify which vehicle will deliver water, how the water will be used

13   (including for which crops or livestock, if any), the projected number of deliveries, and annual

14   water volume. *Id.* ¶ 13. Applicants must swear under penalty of perjury that water is sought for

15   lawful use and not for illegal cannabis cultivation. *Id.* at 14 & ¶ 14. So in practical effect, the

16   application requires persons who use off-parcel water to apply for a permit and supply minutiae

17   about the property where they live, including the parcel number and zoning restrictions, even if

18   they are not the property owners. And as noted above, the County may refuse to issue a permit if

19   the destination property is not in compliance with "any" County Code section. Ord. No. 21-07

20   § 3. Many people in the Shasta Vista Hmong community do not live in approved structures and

21   do not have approved water sources, the very reason they would apply for a permit in the first

22   place.

23        Applications for water truck permits are also likely to be denied to people in the Shasta

24   Vista Hmong community. To obtain a permit, applicants must specify, among other things, their

25   names, the names of their business, their addresses, and their phone numbers; the reasons for the

---

[4] A copy of the application is attached as an unnumbered and unlettered exhibit at the end of this declaration. The permit starts on page 12, using the numbers printed on the top right of the page by the CM/ECF system.

permit; the license plate numbers for the truck; the driver's name and license number; the size of the tank or amount of water; the destination; where the truck will drive; and when deliveries will be made. *See* Second Szendrey Decl. at ¶ 16 & Ex at 16.[5]  In short, the County seems to require every resident to obtain a permit and to know in advance the name and driver's license number of the person who will drive each truck, how large the truck is and what its license plate number is, and when water will be delivered.

The County has also imposed restrictions beyond those listed in the applications.  It does not approve water truck permits if people cannot show they will comply with state and local laws. Skierski Decl. ¶ 6, ECF No. 31-5.  This means, for example, that the County will not approve any permit requesting delivery to an unapproved single-family dwelling, and it will not approve a water truck permit for deliveries to people living on unimproved land—parcels it describes as "campsites"—even if those people have approved "camping" permits.  *Id.* ¶ 6.  As a result, the County would most likely reject permit applications from anyone in Shasta Vista, where most dwellings are unpermitted, as described above.  The County also relies on vaguely defined criteria when approving groundwater extraction permits.  For example, it rejects extraction permit applications "if the source of the extracted water is a priority basin in either the medium to high priority designation."  *Id.* ¶ 5.  It is unclear on the current record which basins are priority basins, who decides whether a basin is a "priority" basin, and what criteria are part of that assessment.

The County has approved very few permits.  In July 2021, about two months after the permit ordinances went into effect, the County had approved only five groundwater extraction permits and fourteen water truck permits.  *Id.* ¶¶ 3–4.  These low numbers appear to be low by design.  They align roughly with the County's expectations of about ten per year.  *See* Testimony of Rick Dean to the Siskiyou Cty. Bd. of Supervisors at 3:72–78 (May 4, 2021), Lawrence Decl. Ex. O-1, ECF No. 4-2.  The County's records show that no plaintiffs have applied for an

/////

---

[5] A copy of the application is attached to this declaration starting on page 16, using the numbers applied to the top right of the page by the CM/ECF system.

1    extraction or water truck permit, and the plaintiffs do not claim to have applied for any permits.[6]

2    *See* Skierski Decl. ¶ 2.

3         Although the County's permit ordinances do not draw distinctions between potable and

4    unpotable water, the Sheriff claims never to have prevented people from delivering potable water.

5    Suppl. LaRue Decl. ¶ 7.  The Sheriff's Office has no records of anyone stopping a car or truck

6    transporting potable water.  *Id.*  Potable water is also available for delivery within Siskiyou

7    County, and the County agrees potable water can be stored safely in tanks available at farm

8    supply stores.  *See* Suppl. Dean Decl. ¶¶ 4–5.  But other barriers have discouraged people from

9    transporting and delivering large quantities of potable water.  Sheriff's Deputies have stopped

10   many Hmong drivers near Shasta Vista, often with questionable justifications, *see, e.g.*, Nathan

11   Thao Decl., ECF No. 4-12; Suppl. Nathan Thao Decl., ECF No. 9-1, Mao Thao Decl., ECF No.

12   4-10; Suppl. Mao Thao Decl., ECF No. 9-3; Dilevon Lo Decl., ECF No. 4-13, sometimes without

13   regard for how much water they were carrying, if any at all, and why, *see, e.g.*, Pao Lee Decl.,

14   ECF No. 4-11; Suppl. Pao Lee Decl., ECF No. 9-9; Antonio Lee Decl., ECF No. 4-6; Suppl.

15   Antonio Lee Decl., ECF No. 9-6, and sometimes without consideration for whether the water

16   suitable for drinking or irrigating crops, *see, e.g.*, Jerry Vang Decl., ECF No. 4-7 ("[T]he water in

17   my truck was dirty and unusable."); *see also* Der Lee Decl. ¶ 9 ("I am afraid of being pulled over

18   for transporting water from Walmart to my home.").

19        Stringent state and federal regulations may be another deterrent.  "For water to be

20   considered potable," the County's Community Development Director explains, "the water and

21   delivery truck must be specifically maintained and licensed."  Suppl. Dean Decl. ¶ 4.  Water

22   haulers must obtain a license from the California Department of Public Health and comply with

23   federal regulations, which require regular inspections, sanitizing, and clear marking.  *See id.*;

24   Dean Decl. ¶ 4.  And "[t]o insure that delivered potable water remains potable for human use, the

25   receiving vessel for the end user must also be maintained enclosed, clean and sanitized for that

26   /////

---

[6] One plaintiff has applied for a different permit, to drill a well, and the County appears neither to have granted nor denied it.  *See* Der Lee Suppl. Decl. ¶ 9.

1  purpose." Suppl. Dean Decl. ¶ 4.  The water trucks people have used to transport water into the

2  Shasta Vista in the past do not meet these standards.  Dean Decl. ¶ 5.

3        Many people who live in Shasta Vista are thus without water for basic needs.  Der Lee, for

4  example, who is a plaintiff, lives in Shasta Vista with his wife.  *See* Der Lee Decl. ¶ 1, ECF No.

5  23; Suppl. Der Lee Decl. ¶ 1, ECF No. 33-2.  He was born in Laos.  Der Lee Decl. ¶ 3.  For many

6  years in his youth, Lee hid in the jungle to escape persecution from Lao forces.  *See id.* ¶ 4.  He

7  later escaped to Thailand and the United States, and in 2015, he moved to Shasta Vista, where he

8  bought 2.5 acres.  *Id.* ¶¶ 5–6.  He and others experienced a "great deal of racial prejudice at the

9  time," so he moved to Minnesota temporarily, but returned the next year.  *Id.* ¶ 6.  He now lives

10  on his land with his wife and their ducks and chickens.  *Id.* ¶ 10.  They rely on livestock and

11  vegetables for food.  *Id.* ¶¶ 10, 12.  He has no well on his property.  *Id.* ¶ 7.  He describes his

12  current living situation as similar to his time in the jungles of Laos, but without water.  *Id.* ¶ 15.

13  Since the County's water ordinances have gone into effect, all of Der Lee's vegetables have died

14  due to a lack of water.  *Id.* ¶ 12.  At least two of his chickens have died due to a lack of water.  *Id.*

15  ¶ 10.  If Der Lee cannot get enough water, he plans to move back to Minnesota, but he cannot do

16  that in the summer because his animals would likely die in transit in the hot weather.  *Id.* ¶ 14.

17        Koua Lee, another plaintiff, also lives in Shasta Vista with his wife.  Koua Lee Decl. ¶ 1,

18  ECF No. 9-8; Suppl. Koua Lee Decl. ¶ 1, ECF No. 24.  They are both from Laos.  Koua Lee

19  Decl. ¶ 2.  They fled to Thailand and then Hawaii in the 1970s.  *Id.* ¶ 3–5.  He worked for IBM in

20  North Carolina, then owned a Chinese restaurant in California.  *Id.* ¶ 5.  He is now disabled and

21  retired.  *Id.*  Koua Lee and his wife previously relied on water transported by water trucks to grow

22  vegetables and keep animals.  Suppl. Koua Lee Decl. ¶ 5.  They now drive to Mt. Shasta Creek

23  for water twice a week.  *Id.* ¶ 4.  They can no longer grow vegetables and do not have enough

24  water.  *Id.* ¶ 5.  Some of their animals recently died from dehydration.  *Id.* ¶ 6.  They can bathe

25  only once a week, and they do not have enough water to stay cool and hydrated.  *Id.*  Koua Lee

26  says he is thirsty all the time and has become depressed.  *Id.*

27        Nhia Thai Vang, another plaintiff, also lives with his wife in Shasta Vista.  *See* Nhia Thai

28  Vang Decl. ¶ 1, ECF No. 9-5; Suppl. Nhia Thai Vang Decl. ¶ 1, ECF No. 26.  They were both

1  born in small villages in Laos.  Nhia Thai Vang Decl. ¶ 1.  During the time of the war in Vietnam,

2  Vang helped intercept communist supplies on the Ho Chi Minh trail.  *Id.* ¶ 2.  He and his wife

3  fled to the jungles of Laos during the 1970s, and they lived there until the late 1980s before

4  immigrating to the United States.  *Id.* ¶¶ 5–6.  They lived in Sacramento until 2015, when they

5  bought land in the Mount Shasta Vista subdivision.  *Id.* ¶¶ 6–7.  They have previously relied on

6  trucked water.  *Id.*  To get water now, they depend on their daughter and son-in-law, who fill two

7  55-gallon drums every three days.  *Id.* ¶ 9.  This is not enough; many of their chickens and ducks

8  have died.  Suppl. Nhia Thai Vang Decl. ¶ 6.

9      Others face similarly desperate circumstances.  *See, e.g.*, Zeng Lee Decl., ECF No. 27;

10  Boua Hue Vue Decl., ECF No. 9-2; Mai Yang Lee Decl., ECF No. 9-7; Khue Cha Decl., ECF No.

11  9-10; Suppl. Khue Cha Decl., ECF No. 25.  Some have resorted to filling jugs of water in a

12  stream in a local park and asking friends for water.  Second Szendrey Decl. ¶ 8, ECF No. 9-12;

13  Zeng Lee Decl. ¶ 8; Suppl. Khue Cha Decl. ¶ 6.  An advocate for the Hmong community asked

14  the Sheriff and County Supervisor to set up water distribution centers at fire stations so people

15  could get water for their personal use, for their animals, and for growing vegetables.  Third

16  Szendrey Decl. ¶ 15, ECF No. 28.  He received no reply.  *Id.*

17      The water shortfall has also hampered firefighting efforts in Shasta Vista.  Before the

18  permit ordinances were passed, people in Shasta Vista relied on an unofficial fire brigade of local

19  water truck drivers.  *See* King Decl. ¶¶ 2–4.  They aver official fire trucks take too long to arrive.

20  Suewasiengboom Saiaaron Lee Decl. ¶¶ 10, 12–13, ECF No. 4-9.  After the County ordinances

21  were passed, two houses in Mount Shasta Vista burned down because water was in short supply

22  and firefighters did not arrive in time.  *Id.* ¶¶ 6–9, 11.

23      Six plaintiffs filed this action in June 2021.  *See generally* Compl., ECF No. 1.  They

24  moved immediately for a temporary restraining order and preliminary injunction barring the

25  County from enforcing the three ordinances described above.  *See generally* Mot., ECF No. 4.

26  The court denied their request for injunctive relief on an ex parte basis, and the parties submitted

27  briefs on an expedited schedule.  *See* Min. Order, ECF No. 5; Opp'n, ECF No. 7; Reply, ECF

28  No. 9.  The court denied the motion.  ECF No. 11.  At the time, none of the plaintiffs had alleged

1  or provided sworn evidence that the County's ordinances would deprive any of them the water

2  required for their basic needs, and they had not shown that an injunction was in the public

3  interest.  *See id.* at 8–11.  The court set a schedule for briefing and a hearing on the motion for a

4  preliminary injunction.  *See id.* at 11.

5          Before these supplemental briefs were due, the plaintiffs requested more time to collect

6  evidence and amend their complaint.  *See* Request to Continue, ECF No. 15.  The court granted

7  that request.  Min. Order, ECF No. 18.  The parties then submitted supplemental briefs, the

8  plaintiffs amended their complaint, and the court held a hearing.  *See* Pls.' Suppl. Br., ECF No.

9  17; Pls.' Second Suppl. Br., ECF No. 21; Def. Suppl. Opp'n, ECF No. 31; Suppl. Reply, ECF No.

10  33; First Am. Compl., ECF No. 29; Hr'g Min., ECF No. 37; Hr'g Tr., ECF No. 40.  Several more

11  people joined as plaintiffs in the amended complaint, which asserts three legal claims:

12      (1)     A claim for declaratory and injunctive relief based on 42 U.S.C. § 1983 and the

13              Fourteenth Amendment Due Process and Equal Protection Clauses, *see* First Am.

14              Compl. ¶¶ 57–91;

15      (2)     A claim for damages based on the same statute and Amendment, *see id.* ¶¶ 92–98;

16              and

17      (3)     A claim for damages based on § 1983 and the Fourth and Fourteenth Amendment

18              protections of "'the privacies of life' against 'arbitrary power,'" *id.* ¶¶ 99–104

19              (quoting *Carpenter v. United States*, 138 S. Ct. 2206, 2214 (2018)).

20  Each of the plaintiffs asserts all three claims against all of the defendants, including the County,

21  the Sheriff, the Board of Supervisors, the County Counsel, and the California Department of

22  Forestry and Fire Protection.  *See generally id.*

23          At hearing on the plaintiffs' motion for a preliminary injunction, the court expressed

24  concern that the parties had not supplied the information it needed to answer the difficult and

25  sensitive questions raised by the plaintiffs' motion.  *See* Hr'g Tr. at 6, ECF No. 40.  For that

26  reason, and in light of the plaintiffs' overlong reply brief, the court permitted the defendants to

16

1   file a surreply, *see* Hr'g Min., ECF No. 37, which they have now done,[7] *see* Surreply, ECF No.

2   41.  The court also referred the parties to a mandatory settlement conference before a Ninth

3   Circuit mediator.  *See* Min. Order, ECF No. 38.  The purpose of the mediation was to exhaust

4   efforts to ensure that people in Shasta Vista had water to meet their basic needs while the motion

5   for a preliminary injunction was pending.  *See id.*  Two amici,  the American Civil Liberties

6   Union of Northern California and the Asian Law Caucus, moved for leave to participate in the

7   mediation and to file an amicus curiae brief in support of the plaintiffs' pending motion.  *See* Mot.

8   Amici, ECF No. 42; Amicus Br., ECF No. 42-1.  The court granted that motion.  Order (Aug. 20,

9   2021), ECF No. 46.  The parties did not agree to a temporary solution during the mediation.

10  **II.    LEGAL STANDARD**

11          "A preliminary injunction is an extraordinary remedy, never awarded as of right."  *Winter*

12  *v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008).  In determining whether to issue a preliminary

13  injunction, courts must consider (1) whether the moving party "is likely to succeed on the merits"

14  (2) whether it is "likely to suffer irreparable harm in the absence of preliminary relief,"

15  (3) whether "the balance of equities tips in [its] favor, and" (4) whether "an injunction is in the

16  public interest."  *Id.* at 20.  The moving party must show an injunction is warranted by "a clear

17  showing."  *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation, quotation marks, and

18  emphasis omitted).

19          Courts within the Ninth Circuit sometimes employ an alternate formulation of the *Winter*

20  test, referred to as the "serious questions" test.  *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir.

21  2012).  Under this test, "[a] preliminary injunction is appropriate when a plaintiff demonstrates

22  . . . that serious questions going to the merits were raised and the balance of hardships tips

23  strongly in plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35

24  (9th Cir. 2011) (quotation marks omitted) (quoting *Lands Council v. McNair*, 537 F.3d 981, 986–

25  87 (9th Cir. 2008)).  The two final factors must also be satisfied.  *See id.*

26  /////

---

[7] The plaintiffs' motion for leave to exceed page limits, ECF No. 36, is thus granted *nunc pro tunc*.

When deciding whether to issue a preliminary injunction, the court may rely on declarations, affidavits, and exhibits, among other things, and this evidence need not conform to the standards that apply at summary judgment or trial. *See Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009); *see also Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial").

## III.   ANALYSIS

### A.   Likelihood of Success on the Merits

For several claims and arguments in the complaint and briefing, the plaintiffs have not shown they are likely to succeed on the merits. The court addresses these claims and arguments at the outset in the interest of guiding future litigation in this case.

First, the plaintiffs' filings refer briefly to Title VI of the Civil Rights Act of 1964 and California Government Code section 11135. *See, e.g.*, Mot. at 25; Second Suppl. Br. at 10. As summarized above, the operative complaint does not include claims under Title VI or Government Code section 11135. As the plaintiffs conceded at hearing, they are thus not entitled to injunctive relief on the basis of Title VI or Government Code 11135.

Second, the plaintiffs refer to the constitutional doctrine of overbreadth. *See* Mot. at 22–23; First Am. Compl. ¶¶ 82–83. They argue the County's ordinances "needlessly intrude upon . . . [their] First Amendment right to freedom of association, [their] Fourth Amendment right to be free from unreasonable searches and seizures, and [their] Fourteenth Amendment rights to equal protection of the laws and due process." Mot. at 22. "The overbreadth doctrine holds that a law is void on its face if it sweeps within its ambit not solely activity that is subject to governmental control, but also includes within its prohibition the practice of a protected constitutional right." *Clark v. City of Los Angeles*, 650 F.2d 1033, 1039 (9th Cir. 1981). The Supreme Court has employed this doctrine "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). This is "particularly" true if "conduct and not merely speech is involved." *Id.* at 615. In that circumstance, "the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id.*

1    The plaintiffs have not cited cases in which courts have applied the overbreadth doctrine

2 in circumstances similar to those present in this case.  The court's own searches have revealed no

3 examples.  The Supreme Court's descriptions of the overbreadth doctrine also suggest it is limited

4 to protections of First Amendment rights.  *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 745

5 (1987) (declining to apply the overbreadth doctrine to a Fifth Amendment due process challenge

6 because the Court has "not recognized an 'overbreadth' doctrine outside the limited context of the

7 First Amendment.").  The Ninth Circuit appears not to have recognized an overbreadth doctrine

8 beyond the First Amendment either.  *See, e.g.*, *Nunez by Nunez v. City of San Diego*, 114 F.3d

9 935, 949 n.2 (9th Cir. 1997) ("The Supreme Court has not applied overbreadth outside the limited

10 context of the First Amendment.  We decline to do so here." (citations omitted)); *but see Clark*,

11 650 F.2d at 1039 ("The overbreadth doctrine has been applied *almost exclusively* in the areas of

12 first amendment expressive or associational rights." (emphasis added)).  Other circuits appear not

13 to have applied the overbreadth doctrine to rights secured by amendments other than the First

14 Amendment.  *See, e.g.*, *United States v. Clark*, 582 F.3d 607, 612 (5th Cir. 2009); *Lutz v. City of*

15 *York*, 899 F.2d 255, 270–71 (3d Cir. 1990); *Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983 F.2d

16 286, 295 (D.C. Cir. 1993).  This court thus declines to apply the overbreadth doctrine to claims

17 not based on First Amendment rights.

18    The plaintiffs have advanced only a brief argument based on the First Amendment: they

19 argue the ordinances violate their right to freely assemble.  *See* Mot. at 22–23; Suppl. Reply at 2.

20 They cite no cases in which courts have found that a person's First Amendment rights were

21 violated in similar circumstances, and the court has found none.  Nor does the operative

22 complaint claim the defendants violated the First Amendment.  It does not cite the First

23 Amendment.  The plaintiffs have not shown they are likely to succeed on the merits of any

24 overbreadth claim, if one is properly pled.

25    The plaintiffs' third claim rests on the Due Process Clause.  Their complaint focuses on

26 the process the County used when it adopted the water ordinances.  *See* First Am. Compl. ¶¶ 67–

27 72 (alleging the County adopted the water truck licensing ordinance using an improper

28 procedure); *id.* ¶¶ 73–75 (alleging the County did not give the plaintiffs a meaningful chance to

19

1  challenge all three ordinances); *id.* ¶¶ 76–81 (alleging the County's procedure was arbitrary and

2  capricious).  Their legal arguments also suggest procedure is their target.  *See, e.g.*, Mot. at 27

3  (arguing the County "passed the Ordinances and Resolution in this case in an irregular manner");

4  Reply at 6–7 (arguing the County seized the plaintiffs' vehicles without an opportunity for a

5  hearing); Suppl. Reply at 10–11 (arguing the plaintiffs have a "'legitimate claim of entitlement' to

6  access water in Siskiyou County" (quoting *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S.

7  1, 11 (1978)).  At hearing, however, the plaintiffs argued for the first time that the County's

8  ordinances also deprived them of due process in a "substantive" sense, and counsel advanced

9  several alternative theories of relief.  *See* Hr'g Tr. at 10–12.  The court will not consider these

10  arguments.  *See, e.g.*, *Hardesty v. Sacramento Metro. Air Quality Mgmt. Dist.*, 935 F. Supp. 2d

11  968, 975 (E.D. Cal. 2013) (declining to consider an argument raised for the first time at hearing);

12  *Day v. Sears Holdings Corp.*, 930 F. Supp. 2d 1146, 1168 n.84 (C.D. Cal. 2013) (same).  Nor will

13  the court consider at this time whether the County has violated the Due Process Clause of the

14  Fourteenth Amendment by affirmatively placing the plaintiffs in a position of danger, as the amici

15  argue.  *See* Amicus Br. at 8–10.  The plaintiffs do not assert that claim in their complaint, and the

16  defendants have not had the opportunity to respond to these arguments.  At this time, the court

17  considers only whether the County's ordinances deprive the plaintiffs of a property right without

18  notice and a reasonable opportunity to be heard.

19      To succeed in this claim, the plaintiffs must show they have a protected property right.

20  *See, e.g.*, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985).  They claim a property

21  right to water under state law.  *See* First Am. Compl. ¶¶ 61–66.  To substantiate that claim, they

22  cite decisions by California courts describing the rights of "riparian users" who own land through

23  which water passes and of "appropriators" who divert water, *id.* ¶ 62; defining water rights as

24  "usufructuary," i.e., as limited to use, and not as rights to ownership, *id.* ¶ 63; giving preference to

25  "natural" over "commercial" water uses, *id.* ¶ 64, and describing rights to water for irrigation as a

26  right in real property, *id.* ¶ 65; *see also* Suppl. Reply at 10–11 (arguing similarly).  The plaintiffs

27  have not, however, cited evidence showing that water flows through or is a part of any real

28  property they own or that the County has wrongly given preference to commercial water uses.

1    Nor have they shown that California law restricts when or how a municipality may restrict water

2    use.  *Cf. Memphis Light*, 436 U.S. at 11 (considering the limitations Tennessee law places on the

3    termination of service by a public utility).  They have not shown they are likely to prove that

4    California law grants them a property right to well water delivered from another parcel by truck,

5    so they have not shown they are likely to succeed on their due process claim.

6         The plaintiffs' final claim, which relies on the Fourteenth Amendment's Equal Protection

7    Clause, presents a much closer question.  The plaintiffs allege the County's ordinances selectively

8    target Hmong immigrants in Shasta Vista.  *See, e.g.*, First Am. Compl. ¶¶ 84–89; Mot. at 23–27;

9    Pls.' Second Suppl. Mem. at 8–9; Suppl. Reply at 20–26.

10        The Equal Protection clause of the Fourteenth Amendment provides that "[n]o State shall

11   make or enforce any law which shall . . . deny to any person within its jurisdiction the equal

12   protection of the laws."  U.S. Const. amend. XIV, § 1.  This clause "is essentially a direction that

13   all persons similarly situated should be treated alike."  *Sampson v. Cty. of L.A. by & through L.A.*

14   *Cty. Dep't of Child. & Fam. Servs.*, 974 F.3d 1012, 1022 (9th Cir. 2020) (quoting *City of*

15   *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).  "To succeed on a § 1983 equal

16   protection claim, the plaintiffs must prove that the defendants acted in a discriminatory manner

17   and that the discrimination was intentional."  *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736,

18   740 (9th Cir. 2000).  The three ordinances the plaintiff's challenge here are facially neutral.  None

19   identifies any racial group.  But even facially neutral government actions can violate the Equal

20   Protection Clause if they have "a racially disproportionate impact" and if the government acted

21   with "racially discriminatory intent."  *Vill. of Arlington Heights v. Met. Hous. Dev. Corp.*, 429

22   U.S. 252, 264–65 (1977).  If these two factors are not present, those government actions are

23   unconstitutional only if they were not "rationally related to a legitimate government interest."

24   *The Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 703 (9th Cir.

25   2009).

26        The plaintiffs have not shown the County's first ordinance (No. 20-13) affects them

27   disproportionately.  That ordinance forbids anyone (a) from "wasting or unreasonably using

28   groundwater" for cultivating cannabis in violation of the County Code, (b) from permitting

21

groundwater to be used to cultivate cannabis illegally on property in their "ownership or possession and control," and (c) from "knowingly" using groundwater extracted in violation of these provisions. *See* Ord. No. 20-13 § 3. This ordinance does not otherwise limit or restrict the use of groundwater. It applies throughout the County. The plaintiffs do not claim they intend to use or extract water to grow cannabis. The ordinance is also rationally related to the County's legitimate interest in preserving scarce groundwater resources in a drought. The court denies the motion to enjoin enforcement of this ordinance.

By contrast, the plaintiffs have shown the second and third ordinances have exacted a heavy and disproportionate toll on the Shasta Vista Hmong community. Unlike the first ordinance, which effectively punishes groundwater use if the County can show it is unlawful, the second and third ordinances effectively prohibit groundwater use and transportation absent proof to the County's satisfaction that the groundwater will be put to legal use. In this way, the second and third ordinances shift the burden of proving lawful use from the County to water suppliers, users, and transporters. That shift has left the Shasta Vista Hmong community without water to drink, to grow food, to raise animals, and to bathe, among other basic needs. Nothing in the record suggests the effect has been the same for other racial or ethnic groups. The County has also limited the water truck permitting ordinance to the one part of its territory where most Hmong residents live. The County disputes none of these conclusions. It argues only that it had no discriminatory intent. *See generally*, *e.g.*, Surreply. The court thus turns to that question.

Racial disparities can sometimes be so extreme that their existence alone proves the government intended to discriminate. *See Arlington Heights*, 429 U.S. at 266. But "it is the rare case where impact alone will be sufficient to invalidate a challenged government action." *Comm. Cmty. Improvement*, 583 F.3d at 703. Two cases are often cited as examples in this category. In *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), San Francisco's Board of Supervisors denied permits to laundries operated by Chinese immigrants, claiming they were a fire risk. *See id.* at 374. But the city had granted permits to all of the similarly situated laundries operated by people other than Chinese immigrants. *See id.* No evidence showed the laundries operated by Chinese immigrants were unsafe or out of compliance with any regulations, and the city had no explanation for the

1   disparate impact.  *See id.* at 373–74.  The disparity alone was proof of intent to discriminate.  *See*

2   *id.*  In *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), the City of Tuskegee, Alabama changed its

3   boundaries from a square "into a strangely irregular twenty-eight-sided figure."  *Id.* at 341.

4   About four hundred of the city's residents were Black before this change, but afterward, only four

5   or five residents were Black—a 99 percent reduction.  *See id.*  The city offered no reason for the

6   change.  *See id.* at 342.  The disparity was enough on its own to prove the city intended to

7   discriminate.  *See id.*

8        The plaintiffs have not shown they will likely prove the extraction and water truck permit

9   requirements are in the same narrow class as the obviously discriminatory government actions in

10  *Yick Wo* and *Gomillion*.  Unlike the defendants in those cases, the County has explained and

11  pointed to evidentiary support for its decision to focus on Shasta Vista.  Illegal marijuana

12  cultivation in and around Shasta Vista is more intense than in other parts of the County, has

13  increased rapidly in scale, and has caused violent crime and conflicts.  *See generally, e.g.*, LaRue

14  Decl. & Exs.; Dean Decl.; Haupt Decl. ¶ 2.  The County also has several legitimate interests in

15  responding to public health and land use concerns specific to Shasta Vista, such as the depletion

16  of groundwater, large numbers of unpermitted dwellings, the lack of permanent potable water

17  sources, the discharge of raw sewage on the ground, the heavy use of unregulated pesticides and

18  other chemicals, and carbon monoxide poisonings.  *See* LaRue Decl. ¶¶ 9–10 & Ex. B; Dean

19  Decl. ¶ 7; Suppl. Dean Decl. ¶¶ 2–4; Kay Decl ¶ 11; Haupt Decl. ¶ 2.

20       Although County officials have sometimes made inconsistent statements about the

21  County's goals, *see* Prev. Order at 5–6, the plaintiffs have cited no authority requiring the County

22  to act with a singular purpose.  "In fact, it is because legislators and administrators are properly

23  concerned with balancing numerous competing considerations that courts refrain from reviewing

24  the merits of their decisions, absent a showing of arbitrariness or irrationality."  *Arlington*

25  *Heights*, 429 U.S. at 265.  The interests the County now cites are legitimate and specific to Shasta

26  Vista.  Nor have the plaintiffs submitted evidence that crime, conflicts, public health problems,

27  permitting problems, or other environmental problems are comparable in other parts of the

28  County where marijuana is cultivated illegally.  They have not offered reliable statistical evidence

1    of overwhelmingly disparate effects.  At most they have shown that the concentration of illegal

2    marijuana cultivation is a disputed question of fact.  *Compare* Conrad Decl. ¶¶ 5–9 & Exs. A–B

3    *with* LaRue Decl. ¶¶ 3–6 & Exs. A–C.

4             When, as here, a racial disparity does not itself prove discriminatory intent, a plaintiff

5    must offer other evidence of discriminatory intent.  *See Arlington Heights*, 429 U.S. at 265–66.

6    The court must undertake "a sensitive inquiry into such circumstantial and direct evidence of

7    intent as may be available."  *Id.* at 266.  The Supreme Court has identified several potential

8    sources of this evidence.  "The historical background of the decision is one evidentiary source,

9    particularly if it reveals a series of official actions taken for invidious purposes."  *Id.* at 267.  But

10   "a consistent pattern of official racial discrimination" is not a "necessary predicate to a violation

11   of the Equal Protection Clause."  *Id.* at 266 n.14.  "The specific sequence of events leading up to

12   the challenged decision" is also relevant.  *Id.* at 267.  "Departures from the normal procedural

13   sequence" may also suggest an intent to discriminate.  *Id.*  "Substantive departures too may be

14   relevant, particularly if the factors usually considered important by the decisionmaker strongly

15   favor a decision contrary to the one reached."  *Id.*  "The legislative or administrative history may

16   be highly relevant, especially where there are contemporary statements by members of the

17   decisionmaking body, minutes of its meetings, or reports."  *Id.* at 268.

18            Here, the plaintiffs have raised serious questions about the County's intent.  First, County

19   officials knew that most if not all of the Hmong families in Shasta Vista were living in

20   unpermitted structures without a reliable supply of potable water and other essentials.  *See*

21   *generally, e.g.*, Kay Decl.; Dean Decl.; Suppl. Dean Decl.  Yet the County expected to grant only

22   a few permits under its groundwater regime.  *See* Dean Testimony, *supra*, at 3:72–78 (May 4,

23   2021).  The text of the permitting ordinances suggests they were intended to end all

24   noncompliance with the County's zoning codes in areas like Shasta Vista.  *See, e.g.*, Ord. No. 21-

25   07 § 1.M–N ("The Board of Supervisors desire to ensure land uses in the unincorporated area of

26   the County are in compliance with Siskiyou County's zoning code . . . . The County continues to

27   receive complaints from constituents of land use violations . . . .").  The ordinances refer to the

28   Board's intent to prevent "the construction of thousands of unpermitted structures within which

1  workers illegally reside."  Ord. No. 21-08 § 1.J.  The County has also rebuffed attempts at

2  compromises that might have prevented people in Shasta Vista from suffering from lack of water

3  during the hottest parts of the year.  Third Szendrey Decl. ¶ 15.  It is difficult to square the

4  County's claims of concern about the health and well-being of people in Shasta Vista with its

5  decision to cut off their water supply completely.  This evidence supports the plaintiffs' claims

6  that the County intends its permitting ordinances to have the effect of forcing people in Shasta

7  Vista out of their homes.

8       Second, the County's permits are uniquely burdensome for people in the Shasta Vista

9  Hmong community to obtain.  Permits are unavailable to anyone who cannot affirmatively prove

10  compliance with zoning and other land use ordinances, so they are likely beyond the reach of the

11  Hmong community at large.  *See* Skierski Decl. ¶¶ 5–6.  The County requires permit applicants to

12  supply many specific details in advance, including, for example, the assessor's parcel number and

13  zoning information, the license number and license plate of every person who will drive every

14  water truck, and where and when each truck might be found.  *See* Second Szendrey Decl. Exs. at

15  12–16.  It is difficult to understand what purpose these requirements might serve other than to

16  deter lay people from applying for permits.  The County has also given its officials broad

17  "discretion" to deny water truck permits, Siskiyou Cty. Code § 3-4.1504, and officials face no

18  deadlines when reviewing permit applications, *see id.* §§ 3-4.1504, 3.5-13.104, 3.5-13.105.  The

19  plaintiffs have offered evidence that people in the Hmong community may feel the burdens of

20  these regulatory requirements more acutely than others, for example because of a longstanding

21  cultural distrust of government and language barriers.  *See, e.g.*, Suppl. Der Lee Decl. ¶ 7.

22       Third, County officials have used concerning language when describing their intent.  One

23  defendant has echoed vague claims of cartels and criminal gangs in Shasta Vista.  *See* Suppl.

24  Reply at 25 & n.7.  The Sheriff has emphasized the importance of directing "anger at the right

25  people," not the "good people in the county that have agriculture."  LaRue Hr'g Testimony,

26  *supra*, at 6:162–64.  The permitting ordinances, he explained, were "just another tool for us to

27  choke out . . . the water issue that's enabling everything."  *Id.* at 7:219–20.  He asked for

28  "cooperation" from "our local people" to help "get to the bottom of this and really choke it out."

1  *Id.* at 7:206–07.  These statements may, of course, have an innocent explanation.  *Cf.* Suppl.

2  LaRue Decl. ¶ 4 (denying discriminatory intent).  But their context, including local antipathy

3  toward the Hmong community, *see, e.g.*, King Decl. ¶¶ 8–10, 14, raises serious questions about

4  how these comments would likely be interpreted by the public, despite any innocent explanation.

5  "[T]he use of 'code words' may demonstrate discriminatory intent."  *Ave. 6E Invs., LLC v. City of*

6  *Yuma, Ariz.*, 818 F.3d 493, 505 (9th Cir. 2016) (quoting *Galdamez v. Potter*, 415 F.3d 1015, 1024

7  n.6 (9th Cir. 2005)).

8          Fourth, the County's permitting ordinances are a poor fit for its purposes.  In a number of

9  respects the ordinances drop an inexplicably heavy hammer.  If the County's goals are truly to

10  prevent people from living in dangerous structures, to prevent environmental harms, to reduce

11  crime, and to stop commercial drug production in Shasta Vista, for example, it could enforce

12  zoning ordinances, environmental regulations, and criminal laws rather than cutting off the water

13  supply.  As the Sheriff conceded, the County has had "ordinances . . . on the books for many

14  years" and has not "taken an aggressive approach to implementing or . . . enforcing" them.

15  LaRue Hr'g Testimony, *supra*, at 6:172–74.  In other respects, the permitting ordinances are

16  inexplicably narrow.  The County could have named more roads than just a few in the region

17  where most Hmong people live, given that it has information about many other grow sites within

18  its borders.  *See generally* Suppl. LaRue Decl. Ex. A.

19          The court cannot say at this juncture that this evidence will likely be enough for the

20  plaintiffs to prevail in their claims of discriminatory intent.  As explained above, the County's

21  interests in preventing crime, environmental harm, water waste, and dangerous living conditions

22  are legitimate and also supported by evidence.  The County has introduced evidence showing it

23  has exhausted many other options and turned to these permitting ordinances as something of a last

24  resort.  But on the current record, the plaintiffs have raised "serious questions" about the merits of

25  their claims.  The court thus turns to the remaining *Winter* factors.

26          **B.          Irreparable Harm, the Public Interests, and the Balance of Equities**

27          The next factor is irreparable harm.  The plaintiffs have introduced undisputed evidence

28  that the County's permitting ordinances are depriving some of them of water for drinking,

1   cooking, growing food, raising animals, and bathing.  *See, e.g.*, Der Lee Decl. ¶ 7–15; Suppl.

2   Koua Lee Decl. ¶¶ 4–7; Khue Cha Decl. ¶¶ 4–6; Nhia Thai Vang Decl. ¶¶ 4–7.  Some have

3   already lost crops and animals.  *See, e.g.*, Nhia Thai Vang Decl. ¶ 6.  Without an injunction, more

4   animals will likely die, people will suffer from a lack of water, and some will likely be forced to

5   leave their homes behind.  *See, e.g.*, Der Lee Decl. ¶ 14.  These are irreparable harms.

6        The final two *Winter* factors, the balance of equities and the public interest, merge here

7   because the defendants are government actors.  *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d

8   1073, 1092 (9th Cir. 2014).  As the court recognized in its previous order, "[t]here are weighty

9   public interests on both sides of the balance."  Prev. Order at 10.  Now, however, with a more

10  developed record, this balance tips sharply in favor of an injunction.

11       Without an injunction, the plaintiffs and other members of the Shasta Vista Hmong

12  community will likely go without water for their basic needs and will likely lose more plants and

13  livestock.  Fires may burn more homes.  People may be forced to leave their homes and land

14  behind without compensation.  Water extraction and transportation permits are likely beyond

15  reach.  The plaintiffs have also raised serious questions about their constitutional right to be free

16  from racial discrimination, and "[i]t is well established that the deprivation of constitutional rights

17  'unquestionably constitutes irreparable injury.'"  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th

18  Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

19       A preliminary injunction will not come without costs, but these costs are negligible in

20  comparison to the heavy hardships reviewed above.  Illegal marijuana cultivation may take root

21  again in Shasta Vista, but if it does, the County has the criminal law and Ordinance 20-13 at its

22  disposal.  People may continue to live in unpermitted and dangerous structures, but if so, the

23  County has zoning codes and land use regulations it may enforce, and it can remediate violations

24  and help people avoid danger.  Shasta Vista residents might drink and bathe in unpotable water

25  trucked into Shasta Vista from nearby agricultural wells, but the alternative is very little water or

26  no water at all.  If potable water is in fact ready available, as the County claims, *see generally*

27  Suppl. Dean Decl., this order in no way prohibits officials from helping the people in Shasta Vista

28  find and use that potable water.  The County could also move to dissolve the injunction granted

1    here if it passes new ordinances that do not impose the same burdens, if it creates simple permit

2    requirements that do not weigh unfairly on Hmong community members, or if it ensures people in

3    Shasta Vista will have a safe and adequate source of water other than trucked groundwater while

4    this case is pending.  But the dehydration and de facto expulsion of a disfavored minority

5    community cannot be the price paid in an effort to stop illegal cannabis cultivation and any

6    attendant harms.

7    **IV.    CONCLUSION**

8         The motion for a preliminary injunction is **granted in part**.  Until further order of this

9    court, Siskiyou County and its officers, agents, employees, and any person acting in concert with

10    it are **enjoined** from enforcing Siskiyou County Ordinance Nos. 21-07 and 21-08, both adopted

11    on May 4, 2021.

12         This order resolves ECF Nos. 4 and 36.

13         IT IS SO ORDERED.

14    DATED:  September 3, 2021.

CHIEF UNITED STATES DISTRICT JUDGE