1

2

3

4

5

6

7

8                         UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    Dilevon Lo, et al.,                         No. 2:21-cv-00999-KJM-AC

12                      Plaintiffs,               ORDER

13          v.

14    County of Siskiyou, et al.,

15                      Defendants.

16

17          While this case is pending, this court enjoined Siskiyou County from enforcing two

18    ordinances that would likely cut off the water supply to a predominantly Hmong community

19    within its borders.  Although the County cited legitimate concerns when it adopted these

20    ordinances, such as preventing people from using scarce groundwater to grow marijuana illegally

21    on a commercial scale, serious questions surrounded its intentions.  The County has now

22    modified the two ordinances by resolution, but not amendment, and has clarified the system of

23    permits they created.  It moves to dissolve the preliminary injunction blocking the two

24    ordinances.  The County's changes resolve some concerns and reduce the chance people will go

25    without water for their basic needs, but the County has not established the injunction is no longer

26    warranted. **The court denies the motion as explained below**.

27          Although the County has not shown that changes to its permitting ordinances currently

28    justify revisions to or dissolution of the preliminary injunction, it has shown that a modified

1

preliminary injunction could potentially minimize the risks of irreparable harms to the plaintiffs and simultaneously loosen the injunction's strictest terms.  This matter is thus **referred to a mandatory court-convened settlement conference** to explore that possibility.

## I.        BACKGROUND

Although California law allows marijuana use and distribution in some circumstances, California cities and counties can restrict or prohibit marijuana use and distribution.  Prelim. Inj. (Sept. 3, 2021) at 2 n.1, ECF No. 47.  For several years, Siskiyou County has been attempting to reverse a burgeoning trend of commercial cannabis cultivation within its borders.  *See id.* at 1–2.  Large-scale cannabis cultivation in the County is impossible without large volumes of water for irrigation, and water has become more precious in recent years as a result of prolonged and often severe droughts.  *See id.* at 7, 10.  The County banned commercial cannabis cultivation in 2015, declared a state of emergency in 2018, and banned the use of groundwater for illegal cannabis cultivation in 2020.  *See id.* at 2, 7–8.

After the ordinances were adopted, violent crime spiked in many places where marijuana was illegally grown.  *See id.* at 5, 10; *see also* LaRue Decl. ¶¶ 6–7, ECF No. 57-4 (reporting that violent crime has continued in recent months).  Commercial growers flouting the County's rules also used dangerous or illegal pesticides, herbicides, fertilizers, and other chemicals, and workers lived in dangerous and unsanitary conditions.  *See* Prelim. Inj. at 5, 10.  Some people who lived or worked at illegal grow sites died in unsafe structures as a result of carbon monoxide poisoning.  *See id.* at 5.  Traditional law enforcement efforts to curb these problems proved ineffective or prohibitively expensive.  *See id.* at   2, 3.

In 2021, after recognizing that most commercial cannabis growers irrigate their crops with well water delivered by truck, the County adopted two emergency ordinances.  *See id.* at 8–10.  One requires permits for groundwater extraction for use off parcel.  *See id.*  The other imposes a permit requirement for transporting groundwater by truck.  *See id.*  Groundwater extraction and trucking are misdemeanors without these permits, and unpermitted water trucks can be seized.  *See id.*

These permitting ordinances had immediate effects as well, and not just on the illegal grow operations. Many of these operations are concentrated in an area known as the Mount Shasta Vista Subdivision, "MSV" or "Shasta Vista" for short. *See id.* at 3–4. Shasta Vista is predominantly Hmong. *Id.* at 5. Many Hmong people in Shasta Vista do not speak English as their first language, do not understand how to establish a residence legally, and harbor suspicions of government and authority due to historic persecution at the hands of communist authorities in Laos. *See id.* at 6. Many have thus built houses and other structures without the necessary permits and without access to a permanent source of useable water. *See id.* at 6–7. They depend on trucked groundwater for their basic needs—the very same groundwater that is subject to the County's recent prohibitions. *See id.*

For many of the same reasons Hmong people in Shasta Vista do not establish legal residences or obtain building permits, they could not or would not obtain water extraction and trucking permits. *See id.* The permit applications also required a great deal of specific information that would be difficult for most lay people to obtain. *See id.* at 11–12. For example, applicants were required to provide zoning information and assessor's parcel numbers. *See id.* For these reasons, when the two permitting ordinances came into effect, many people in Shasta Vista were without water for drinking, bathing, growing food, raising livestock, and their other basic needs during the hottest months of the year. *See id.* at 11–15.

Several Hmong people from Shasta Vista filed this lawsuit in June 2021, a few months after the groundwater restrictions went into effect. *See generally* Compl., ECF No. 1. They moved immediately for a temporary restraining order and a preliminary injunction, claiming the County's ordinances deprived them of rights under the Fourteenth Amendment's Due Process and Equal Protection clauses, among other things. *See generally* Mot., ECF No. 4. The court denied their request for a temporary restraining order but later granted their motion for a preliminary injunction. *See generally* Order Den. TRO at 8–11, ECF No. 11; Prelim. Inj., ECF No. 47.

When the court issued the preliminary injunction, it held that the plaintiffs' equal protection claim was the only claim likely enough to succeed so as to justify a preliminary injunction. *See id.* at 18–26. The challenged ordinances do not single out anyone by race, so the

1    plaintiffs' only path to success would be to prove the ordinances had a "racially disproportionate

2    impact" and were enacted with "racially discriminatory intent." *Id.* at 21 (quoting *Vill. of

3    Arlington Heights v. Met. Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977)).  The plaintiffs cited

4    evidence showing the two ordinances exacted a heavy and disproportionate toll on Hmong people

5    in Shasta Vista.  *See id.* at 22.  The court found they were likely to prevail on that point as the

6    case continued.  *Id.*

7            Discriminatory intent was a far more difficult question to answer.  Although the plaintiffs

8    had not shown they were likely to prove, at the end of the day, that the County had acted with a

9    racially discriminatory intent, the plaintiffs had raised "serious questions" about the County's

10   intentions, and in the Ninth Circuit those "serious questions" can justify a preliminary injunction.

11   *See, e.g.*, *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011).  For

12   example, County officials knew that most Hmong families in Shasta Vista were living without a

13   reliable water supply, but the County expected to grant only a handful of permits.  Prelim. Inj. at

14   24.  The permits required applicants to supply a great deal of specific information, such as the

15   assessor's parcel number and zoning category, water needs, expected driving routes, and other

16   minutiae, and the reasons for imposing such specific requirements were unclear.  *See id.* at 11–12,

17   25.  County officials also had broad discretion to deny permits and faced no deadlines to act.  *Id.*

18   at 25.  It was difficult to understand what purpose this burdensome and opaque permitting scheme

19   might serve if not to deter Hmong people from applying for permits.  *Id.*  Anti-Asian vitriol,

20   vigilantism, intimidation, and racially motivated violence has also beset Siskiyou County in

21   recent years, and County officials used concerning language to describe their goals.  *See id.* at 6,

22   25–26.  The court could not discount the possibility this language tacitly validated anti-Asian

23   sentiments.  *See id.* at 25–26.  The County also knew about many illegal grow sites other than in

24   Shasta Vista, but it had limited its water truck permitting ordinance to a few roads around Shasta

25   Vista—exactly where the County's Hmong population is concentrated.  *See id.* at 26.

26           It bears repeating that this evidence did not prove the County, its Board of Supervisors, or

27   other officials intended to discriminate.  *Id.*  Rather, the plaintiffs had raised serious questions

28   about the intentions behind the County's permitting ordinances, and the court could not

4

immediately answer those questions.  *See id.*  The plaintiffs also proved they were likely to suffer irreparable harm, and the balance of hardships tipped sharply in their favor.  They and many others would likely go without water for their basic needs if the two permitting ordinances remained in effect.  *See id.* at 26–28.  The court therefore granted their motion for a preliminary injunction and stopped the County from enforcing the two permitting ordinances until this case could be resolved.

As it confirmed at hearing, the County has complied with the injunction and has stopped enforcing the two permitting ordinances.  LaRue Decl. ¶ 15, ECF No. 57-4.  Water truck deliveries have resumed.  *Id.*  Deliveries occur mostly at night, but daytime deliveries have increased in recent weeks.  *Id.*  The Sheriff's Office "has received frequent reports from the public of massive amounts of groundwater being pumped from agricultural properties."  *Id.* Trucks line up to collect water from local ranchers, and although well owners are subject to fines, "the fines are no deterrent given the level of profit to the provider of water."  *Id.*  Drought also has continued to plague Siskiyou County since the court granted the plaintiffs' motion for a preliminary injunction, and California water agencies have restricted off-parcel groundwater use, but not if necessary to meet basic needs, such as growing food and cooking.  *See, e.g.*, Dean Decl. ¶¶ 22–23 & Ex. C at 4, ECF No. 57-3.

When the court granted the motion for a preliminary injunction, it noted the County could move to dissolve that injunction if it adopted "new ordinances that do not impose the same burdens," if it imposed "simple permit requirements that do not weigh unfairly on Hmong community members," or if it ensured "people in Shasta Vista will have a safe and adequate source of water other than trucked groundwater while this case is pending."  Prelim. Inj. at 27–28. Taking that cue, the County modified the two ordinances through resolutions of its Board of Supervisors.  *See* Siskiyou Cty. Code §§ 3-4.1501 to .1506 & 3.5-13.101 to .109.  The full text of the permanent ordinances is included in an appendix to this order for ease of reference.  The County's Board of Supervisors also expanded the truck-permitting ordinance county-wide.  Haupt Decl. ¶ 3, ECF No. 57-5.  A resolution now also exempts trucks from the permit requirement if they comply with potable water transport regulations.  *Id.*  Finally, County officials simplified

permit applications and clarified application requirements. *See generally* Dean Decl. & Exs. A–B, ECF No. 57-3.

In addition, the County represents it has made clear the plaintiffs may apply for permits to drill wells on their land in Shasta Vista. Mem. at 11–12, ECF No. 57-1. There is no moratorium on well drilling, as some have believed in the past. *See* Prelim. Inj. at 7 (citing Griset Decl. ¶ 8, ECF No. 9-11). But at least two Hmong people in Shasta Vista have run into roadblocks when attempting to apply for permits. Koua Lee, a plaintiff who owns land in Shasta Vista, says he applied for a well-drilling permit five years ago, but the permit has gone nowhere. Koua Lee Decl. ¶ 6, ECF No. 62-1. In February 2022, he went to the County office to renew his permit application, but the people he spoke to told him the County has no well inspector and there is a long list of applications, "so it will be a couple years from now before [the County] can get it approved." *Id.* Khue Cha, another plaintiff and Shasta Vista property owner, says the County has not allowed him and others to apply for any permits since a 2021 wildfire. *See* Khue Cha Decl. ¶ 10, ECF No. 62-2; *see also* Schenone Decl. ¶¶ 3–10, ECF No. 31-4 (describing the fire and evacuation).

The County now moves to dissolve the preliminary injunction, citing the changes and clarifications summarized above. *See generally* Mot., ECF No. 57; Mem., ECF No. 57-1. The plaintiffs oppose that motion, *see generally* Opp'n, ECF No. 61, as do the ACLU of Northern California and Asian Law Caucus, whom the court has again permitted to participate as amici, *see* Amicus Br., ECF No. 60-1; Order, ECF No. 68. The County filed a reply, ECF No. 67, and the court held a hearing on April 15, 2022, *see* Minutes, ECF No. 72. Allison Margolin and Geoffrey Gallegos appeared for the plaintiffs. Scott Donald appeared for the County. John Do, Stanley Young, and Emi Young appeared for the amici.

Some of the County's legal arguments could be interpreted as contending that the injunction or the whole case is now moot. *See* Mem. at 9–10. The County clarified at hearing it does not contend the case is moot, rather only that the injunction is. Regardless of how the County characterizes its arguments, this court must ensure it has subject matter jurisdiction, both

1    to hear the case and to impose injunctive relief.  *See MetroPCS Cal., LLC v. Picker*, 970 F.3d

2    1106, 1117 (9th Cir. 2020).  The court begins with this threshold jurisdictional question.

3    **II.    JURISDICTION**

4          Private people and businesses cannot normally moot the claims against them by changing

5    their conduct.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.* (*TOC*)*, Inc.*, 528 U.S. 167, 189

6    (2000).  If they could, courts would have no choice but to leave them to return to their "old

7    ways."  *Id.* (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n.10 (1982)).

8    But when government officials are sued and then change their conduct, federal courts grant them

9    greater "solicitude."  *Bd. of Trustees of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d

10   1195, 1198 (9th Cir. 2019) (en banc) (quoting *Am. Cargo Transp., Inc. v. United States*, 625 F.3d

11   1176, 1180 (9th Cir. 2010)).  Although "there is always the possibility of bad faith and a change

12   of heart," courts "presume the government is acting in good faith."  *Am. Cargo Transp.*, 625 F.3d

13   at 1180.  "For this reason, the repeal, amendment, or expiration of challenged legislation is

14   generally enough to render a case moot and appropriate for dismissal."  *Glazing Health &*

15   *Welfare*, 941 F.3d at 1198.

16         Sometimes, however, a case might not be moot even if a challenged law or ordinance has

17   been repealed or modified.  "For example, in *City of Mesquite v. Aladdin's Castle, Inc.*, the

18   Supreme Court refused to dismiss an appeal as moot where a city had revised a challenged

19   ordinance but was reasonably expected to reenact offending provisions because it had announced

20   its intention to do so."  *Id.* (citing 455 U.S. at 289 & n.11).  A controversy might also remain

21   alive, and the court would have jurisdiction to resolve it, if the law or ordinance the plaintiff

22   originally challenged has been replaced with a similar law or ordinance that imposes a similar but

23   lesser burden.  *See Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*,

24   508 U.S. 656, 662–63 (1993).

25         The Ninth Circuit recently clarified the rule for deciding whether a case against a

26   governmental defendant fits the exception to the presumption of good faith.  The court presumes

27   "the repeal, amendment, or expiration of legislation will render an action challenging the

28   legislation moot, unless there is a reasonable expectation that the legislative body will reenact the

7

1    challenged provision or one similar to it." *Glazing Health & Welfare*, 941 F.3d at 1199.  "The

2    party challenging the presumption of mootness need not show that the enactment of the same or

3    similar legislation is a virtual certainty, only that there is a reasonable expectation of

4    reenactment." *Id.* (quotation marks omitted).  This determination "must be founded in the

5    record, . . . rather than on speculation alone." *Id.*

6         To the plaintiffs, Siskiyou County's permitting ordinances are just as objectionable today

7    as they were when this case began.  Although the County has modified the ordinances by

8    resolution, and although County officials have revised and simplified permitting requirements, if

9    Hmong people in Shasta Vista cannot obtain the necessary permits, they will probably not have

10   water to grow food, raise animals, cook, clean, or bathe.  In this sense, they are in the same

11   situation as the plaintiffs the Supreme Court wrote about in *Associated General Contractors*, 508

12   U.S. at 662–63.  As in this case, the plaintiffs there had challenged a local ordinance, and the

13   government had repealed and replaced it while the litigation was pending.  *See id.* at 658–59.  The

14   new ordinance might have been somewhat less objectionable to them, but it caused them the same

15   disadvantage, albeit to a "lesser degree." *See id.* at 662-63.

16        Here, given the limitations in the County's changes, the court has jurisdiction to uphold

17   the injunction or to dissolve or modify it.

18   **III.   DISSOLVING OR MODIFYING THE PRELIMINARY INJUNCTION**

19        "The power of a court of equity to modify a decree of injunctive relief is long-established,

20   broad, and flexible." *Brown v. Plata*, 563 U.S. 493, 542 (2011) (citation omitted).  When a party

21   asks to modify or dissolve an injunction, the court considers whether "a significant change in

22   facts or law warrants revision or dissolution." *Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir.

23   2019) (per curiam) (quoting *Sharp v. Weston*, 233 F.3d 116, 1170 (2000)).  "[A] motion to

24   modify a preliminary injunction is meant only to relieve inequities that arise after the original

25   order." *Credit Suisse First Bos. Corp. v. Grunwald*, 400 F.3d 1119, 1124 (9th Cir. 2005) (quoting

26   *Favia v. Ind. Univ. of Pa.*, 7 F.3d 332, 228 (3d. Cir. 1993)).  It "must rest on grounds that could

27   not have been raised before." *Alto v. Black*, 738 F.3d 1111, 1120 (9th Cir. 2013).  Otherwise a

28   party could "regain its lost opportunity" to appeal a preliminary injunction "simply by making a

1   motion to modify or dissolve the injunction, having the motion denied, and appealing the denial."

2   *Karnoski*, 926 F.3d at 1198 (quoting *Gon. v. First State Ins. Co.*, 871 F.2d 863, 866 (9th Cir.

3   1989)).  For that reason, this court will not revisit its prior decision to impose a preliminary

4   injunction.  Nor will the court consider now, for the first time, any evidence and arguments the

5   parties could have presented before but did not.

6       The legal test for dissolving or modifying an injunction has two parts: the moving party

7   must show not only that the facts or the law have changed significantly, but also that in light of

8   these changes, the injunction should be dissolved or modified under the legal standard that

9   governed the issuance of the injunction in the first place.  *See Karnoski*, 926 F.3d at 1198 & n.14.

10  The court considers whether any changes are "significant," and if so, whether the changes

11  "warrant[] revision or dissolution of the injunction."  *Sharp*, 233 F.3d at 1170.

12      **A.    "Significant" Change**

13      The court begins with what is unchanged.  Although the County's ordinances matured

14  from urgency ordinances into permanent ordinances, the County has identified no practical

15  difference between urgency and permanent ordinances, and the court is not aware of any

16  difference that makes the preliminary injunction unjust.  Nor do the terms of the current

17  ordinances differ meaningfully from the terms of the urgency ordinances the court considered

18  before.  The backdrop against which this litigation has played out is also unchanged in most

19  respects.  No one disagrees, for example, that illegal cannabis grow sites continue to thrive, that

20  people in Shasta Vista still depend on trucked groundwater both to satisfy basic needs and to

21  irrigate commercial cannabis crops, that drought conditions persist, or that violent crime has not

22  abated.

23      The parties do disagree, ardently, about whether County officials were motivated by race

24  in their adoption of the ordinances.  Regardless of how acrimonious this dispute has become, the

25  court need not resolve it now.  The evidence the parties rely on in contesting the County's

26  intentions does not illustrate what has changed since this court issued the preliminary injunction;

27  it is evidence about what the County and its officials knew and did before.  The court will not

28  reconsider its decision to impose a preliminary injunction, and it will not weigh evidence and

9

1    arguments that could have been raised before but were not.  *See Karnoski*, 926 F.3d at 1198; *Alto*,

2    738 F.3d at 1120.  Summary judgment and trial are more appropriate forums for relitigating these

3    disputes.

4            Some circumstances have changed, however, since this court entered the preliminary

5    injunction, as summarized above.  First, both the truck ordinance and the extraction ordinance

6    now apply throughout the County, whereas the truck ordinance was previously enforced only on

7    roads near Shasta Vista.  Second, the Board of Supervisors has clarified in a resolution that trucks

8    carrying potable water are not subject to the permit ordinances.  Third, the County's permit

9    applications are simpler and clearer in several ways.  These changes, discussed in more detail

10   below, respond to some of the primary criticisms the plaintiffs raised to justify their original

11   request for a preliminary injunction.  They also lessen the burdens of applying for a permit.  For

12   these reasons, they are "significant" in the necessary sense.  *See, e.g.*, *Karnoski*, 926 F.3d at 1199

13   (holding modifications to challenged military policy were "significant" in part because they

14   responded to criticisms previously raised and changed how policy operated).  The question, then,

15   is whether these changes warrant any modifications to the preliminary injunction or its

16   dissolution.

17           **B.      Revision or Dissolution**

18           Ordinarily, when a court is deciding on a clean slate whether to issue a preliminary

19   injunction, the moving plaintiffs must show (1) they are "likely to succeed on the merits" and

20   (2) "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of

21   equities tips in [their] favor" and (4) "an injunction is in the public interest."  *Winter v. Nat. Res.*

22   *Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "Alternatively, 'serious questions going to the merits

23   and a balance of hardships that tips sharply towards the plaintiff can support issuance of a

24   preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable

25   injury and that the injunction is in the public interest."  *City & Cty. of San Francisco v. U.S.*

26   *Citizenship & Immigr. Servs.*, 944 F.3d 773, 789 (9th Cir. 2019) (quoting *All. for the Wild*

27   *Rockies*, 632 F.3d at 1135).

But if the court is not writing on a clean slate—if a plaintiff has carried its burden and a preliminary injunction is already in place—a defendant who seeks to dissolve the injunction is the one who must demonstrate its entitlement to that relief. *Karnoski*, 926 F.3d at 1198. The Ninth Circuit has not explained clearly what that burden entails. In *Karnoski*, the most recent published opinion applying this test, the circuit initially described a district court's task using quite permissive language. The district court "should be guided by the same criteria that govern the issuance of a preliminary injunction," it wrote, and it identified "factors" for the district court to consider. *Id.* at 1198–99 & n.14. After the panel elaborated on these "factors," however, it used much more restrictive language, and it emphasized the plaintiff's burden instead:

> [T]he district court . . . must apply the "traditional" standard for injunctive relief to determine whether dissolution of the injunction is warranted, addressing: (1) whether Plaintiffs have made a sufficient showing of a likelihood of success on the merits; (2) whether Plaintiffs will be irreparably harmed absent interim relief; (3) whether the issuance of an injunction will substantially injure other parties; and (4) where the public interest lies.

*Id.* at 1202. The circuit then offered citations to cases interpreting the standard for motions for stays pending appeal and permanent injunctions, but not preliminary injunctions. *See id.* (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009); *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1243 (9th Cir. 2018); and *Washington v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017)).

On remand in *Karnoski*, the parties agreed to vacate the preliminary injunction, so the district court had no need to confront the uncertainties in the circuit's instructions. Other district courts have since interpreted those instructions differently. One has required the moving party to prove it is entitled to relief from the preliminary injunction under all four of the relevant criteria, whether those criteria are imposed directly or through the alternative test for cases of "serious questions." *See CW Baice Ltd. v. Wisdomobile Grp. Ltd.*, No. 20-03526, 2021 WL 3053147, at *4 (N.D. Cal. July 20, 2021). This interpretation creates a conjunctive test: the defendant must prove an injunction is unwarranted under each of the four criteria. *See id.* By contrast, another district court read *Karnoski* as holding that a party seeking to dissolve a preliminary injunction will prevail if it shows the plaintiffs cannot now satisfy all four parts of the test. *See Index*

1   *Newspapers LLC v. City of Portland*, No. 20-1035, 2022 WL 72124, at *9 (D. Or. Jan. 7, 2022).

2   This interpretation creates a disjunctive test; the defendant may prevail by disproving any one or

3   more of the four criteria. *See id.*

4       Although no district court appears to have said so, a third interpretation is also plausible.

5   To borrow the terms of *Karnoski*, it would be reasonable to conclude that a district court may be

6   "guided by" the "traditional" standard for injunctive relief and "address[]" each part of that

7   standard without applying the standard mechanically or as a checklist.  926 F.3d at 1199, 1202.

8   This more flexible interpretation recognizes district courts' "wide" discretion to ensure their

9   injunctions are just and to fit those injunctions to the evolving circumstances of each case. *See,*

10   *e.g.*, *Brown*, 563 U.S. at 542; *see also, e.g.*, *Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v.*

11   *Wright*, 364 U.S. 642, 648 (1961); *A&M Recs., Inc. v. Napster, Inc.*, 284 F.3d 1091, 1098 (9th

12   Cir. 2002).

13       The plaintiffs and amici argue the result would be the same no matter which test the court

14   applies.  Indeed, many motions to modify or dissolve injunctions will probably not stand or fall

15   on the choice of test.  *Cf. CW Baice*, 2021 3053147 at *4–7 (expressing the test in conjunctive

16   terms but continuing to address each of the four parts even after the defendants fell short of the

17   first part).  The court is loath to assume merely that one or another interpretation is correct in light

18   of the sensitive and difficult conflicts in this case and so confronts the question directly here in

19   the interests of clarity and certainty.

20       It might be tempting to conclude that a district court should use a flexible version of the

21   preliminary injunction test, one that treats the four traditional prerequisites to a preliminary

22   injunction like factors in a multi-part test.  District courts do have wide discretion to dissolve or

23   modify injunctions, but "[d]iscretion is not whim, and limiting discretion according to legal

24   standards helps promote the basic principle of justice that like cases should be decided alike."

25   *Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 139 (2005).  A preliminary injunction is also "an

26   extraordinary remedy never awarded as of right," *Winter*, 555 U.S. at 24, a "drastic" form of

27   relief, *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted).  The legal standard a court

28   applies to motions for preliminary injunctions ensures this extraordinary remedy is employed

12

only in appropriate circumstances.  Together, the four parts of the established test balance the competing interests that "arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined." *Nken*, 556 U.S. at 434.  On one side of this balance is the likelihood the plaintiffs will eventually prevail, but before then will suffer an irreparable harm unless the court preserves the status quo.  *See Winter*, 555 U.S. at 20; *Munaf*, 553 U.S. at 690.  On the other side is the harm that would likely come to those who oppose the injunction, and to the broader public, if the court enjoins them while the plaintiffs attempt to prove their case.  *See Winter*, 555 U.S. at 24.

Viewing the question in this way demonstrates why a defendant who seeks to modify or dissolve an injunction should not be required to prove that each element of the four-part test weighs in its favor.  For one, if circumstances change, a continuing injunction might prove to be unjust even though the plaintiff is no less likely to prevail at the end of the day.  That might be true, for example, if the intervening change drastically exacerbates the injunction's negative consequences for the defendants and the greater public.  A defendant who seeks to modify or dissolve the injunction in this situation should not be forced to prove the plaintiff is now also unlikely to succeed on the merits.  A preliminary injunction might be unjust even if the plaintiff's success is likely.  Alternatively, an injunction might no longer be warranted if the plaintiff is much less likely to prevail, but would suffer the same irreparable harm as before.  For example, new legal precedent might deprive the plaintiff of a keystone argument.  In that situation, a defendant should not be held to a previously entered injunction simply because the plaintiff would suffer the same irreparable harm without it; at the end of the day, the plaintiff will likely lose.  Defendants should be permitted to show that the "drastic" and "extraordinary" injunctive remedy is no longer warranted, regardless of the reason.

Turning back to this case, the court granted the plaintiffs' motion for a preliminary injunction because (1) they raised serious questions about the merits of their equal protection claim, (2) without an injunction, they would likely be deprived of water for their basic needs, and (3) the balance of harms and public interest sharply favored a preliminary injunction.  Therefore, the court will now grant the County's motion if it shows (1) no serious questions remain, (2) the

1    plaintiffs are not likely to go without water for basic needs while this action is pending, or (3) the

2    balance of harms and public interest no longer tip sharply in favor of an injunction.

3                                      **1.      Success on the Merits**

4           The County has not proven that no serious questions remain about the plaintiffs' equal

5    protection claim.  Facially neutral government actions like the County's permitting ordinances

6    violate the Equal Protection Clause if they have "a racially disproportionate impact" and the

7    government acted with "racially discriminatory intent." *Arlington Heights*, 429 U.S. at 264–65.

8           As for disproportionate impact, the County's permitting ordinances "exacted a heavy and

9    disproportionate toll on the Shasta Vista Hmong community."  Prelim. Inj. at 22.  The permit

10   requirements effectively "shift[ed] the burden of proving lawful use" to water suppliers, users,

11   and transporters.  *Id.*  The truck ordinance also was limited to the parts of the County where most

12   Hmong people live.  *Id.*  This left Hmong people in Shasta Vista "without water to drink, to grow

13   food, to raise animals, and to bathe, among other basic needs."  *Id.*  No evidence showed that any

14   other racial or ethnic groups suffered similarly.  *Id.*  The County has not cited evidence to show

15   the ordinances would not have this severe and disproportionate effect today.  Although truck

16   permits would now be required throughout the County, no evidence shows any population other

17   than the Hmong community in Shasta Vista relies on trucked water for its basic needs. Now, as

18   before, the record shows Hmong people would likely suffer more acutely than others.

19          As for discriminatory intent, many serious questions remain.  It is no less true today that

20   "County officials knew most if not all of the Hmong families in Shasta Vista were living in

21   unpermitted structures without a reliable supply of potable water and other essentials." *Id.* at 24.

22   It is also still true that "the County expected to grant only a few permits under its groundwater

23   regime" and intended its ordinances "to end all noncompliance with the County's zoning codes in

24   areas like Shasta Vista."  *Id.*  Just as before, the County's ordinances would allow its officials to

25   withhold permits if administrative proceedings are underway "until the subject property or

26   properties are found to be in complete compliance with any and all applicable County Code

27   sections."  Siskiyou Cty. Code § 3.5-13.104.  The County still imposes no deadlines for its

28   processing of permit applications, Prelim. Inj. at 25, and local officials have complete

14

1    "discretion" to decide whether an applicant has shown "good cause" for a water truck permit.

2    Siskiyou Cty. Code § 3-4.1504.  No evidence suggests people in the Hmong community will not

3    "feel the burdens of these regulatory requirements more acutely than others, for example because

4    of a longstanding cultural distrust of government and language barriers."  Prelim. Inj. at 25.

5    Moreover, the passage of time has erased neither the concerning language County officials used

6    to describe their purposes nor the racial animosity Hmong people in Shasta Vista have faced.  *See*

7    Prelim. Inj. at 6, 25–26; *see also* Amicus Br. at 13–14 (summarizing more recent evidence of

8    animus and possible pretext).  In short, the permitting system still drops "an inexplicably heavy

9    hammer" on Hmong people in Shasta Vista.  Prelim. Inj. at 26.

10        That said, the Board of Supervisors' decision to enforce the trucking ordinance throughout

11   its territory, and not just in Shasta Vista, does neutralize one of the concerns this court laid out

12   before.  It is no longer true that permits are required only in the area where most Hmong people

13   live.  That limited geographic focus, however, was only one of the ordinance's questionable

14   features.

15        The County's changes to its permit applications similarly reduce the volume of evidence

16   that suggests discriminatory intent.  But those changes to the applications do not amend the

17   ordinances themselves.  Rather, they demonstrate how much discretion the County's permitting

18   officials enjoy.  The ordinances still allow County officials to delay and deny permits if they

19   identify code violations, and the circumstances surrounding the ordinances' adoption are

20   unchanged.  Serious questions persist.

21                              **2.    Irreparable Harm**

22        Even with these serious questions unanswered, an injunction would no longer be

23   warranted if the County shows the plaintiffs will most likely have water for their basic needs

24   while the case is pending.  The court thus asks whether the changes are sufficient to show the

25   plaintiffs will have enough water?

26        To begin, the express exclusion of potable water from the permitting system adds little to

27   the balance.  First, a reliable source of potable water would not necessarily satisfy the need for

28   water to irrigate food crops, raise animals, and fight fires.  *See* Prelim. Inj. at 14–15 (summarizing

1   evidence of the plaintiffs' needs).  Second, when the preliminary injunction issued, there was no

2   real dispute that the County was not focused on potable water.  The Sheriff's Office had no

3   records of stopping cars and trucks carrying potable water, and the Sheriff claimed without

4   contradiction that his office had never stopped potable water deliveries.  *Id.* at 13.  Nor was there

5   any dispute that potable water was available.  *Id.*  Third, the permitting ordinances were probably

6   not the reason people hesitated to transport and deliver "large quantities of potable water."  *Id.*

7   "Stringent state and federal regulations" on potable water transportation were a likely deterrent.

8   *Id.* at 13–14.  Sheriff's Deputies had also stopped many Hmong drivers "with questionable

9   justifications, sometimes without regard for how much water they were carrying if any at all, and

10  why, and sometimes without consideration for whether the water was suitable for drinking or

11  irrigating crops" at all.  *Id.* (citations omitted).  The County has not shown these other barriers

12  have now been removed.

13          Changes to the permit applications go further toward suggesting water will be available to

14  those who need it while the case is pending.  The water extraction permit is now short and simple.

15  It requires relatively little:

16          •   The name, address, phone number, and email address of the property owner;

17          •   The make, color, and license plate number of the delivery truck;

18          •   The expected use of the water—agricultural, residential, or other;

19          •   The property owner's or another authorized person's certification that the

20              extraction is authorized, "incidental to lawful activity," and "not to allow for or aid

21              in the cultivation of cannabis in violation of the Siskiyou County Code"; and

22          •   A list of the addresses or assessor's parcel numbers for the property receiving

23              groundwater.

24  *See* Dean Decl. Ex. A.  Applicants who complete this form and obtain an extraction permit

25  automatically satisfy the County's requirements for water truck permits.  *See id.* ¶ 8.

26  /////

27  /////

16

1  If a water truck permit is necessary, the application for that permit has not changed as

2  significantly, but it similarly requires mostly simple and readily available information:

3  • The applicant's and business's name (if any), address, and phone number;

4  • The reason for the permit, including an express statement whether the water will

5  be used to cultivate cannabis;

6  • The truck's license plate number, size, and amount of water for delivery;

7  • The driver's name and license number; and

8  • The address or assessor's parcel number of the delivery location.

9  *Id.* Ex. B.

10  The plaintiffs do not claim they cannot supply the information requested in the County's

11  current forms.  They cite three broader roadblocks.

12  First, they point out that the form is available only in English and that cultural barriers

13  remain a hindrance.  *See, e.g.*, Opp'n at 8.  This argument ultimately is not persuasive.  Although

14  many Hmong people in Shasta Vista do not speak English as their first language, Prelim. Inj. at 6,

15  and although many Hmong people harbor cultural suspicions of governmental authority, *see id.*,

16  the court cannot conclude that language and cultural barriers will likely prevent the plaintiffs

17  themselves from applying for permits.  It is irreparable harm to them, not to others, that this court

18  must consider.  *See* Order Den. TRO at 8–9 (citing *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries

19  Serv.*, 886 F.3d 803, 822 (9th Cir. 2018)).  Language and cultural barriers have not dissuaded the

20  plaintiffs from filing and litigating this lawsuit vigorously with the assistance of counsel and

21  others.  Nor have these barriers stopped them from submitting detailed English declarations or

22  from obtaining assistance to prepare those declarations.  Neither the parties nor the amici have

23  cited authority showing the County must provide forms in languages other than English, and the

24  court is currently aware of none.

25  Second, the amici argue the permits will have a "chilling effect" on the "end use" of

26  groundwater overall and will thus "lead to a lack of water haulers."  Amicus Br. at 17.  This

27  argument proves too much.  In effect, it would award a federal injunction to commercial cannabis

28  growers in Siskiyou County regardless of whether the permitting scheme is constitutional.  If the

County's permitting system stops people from using groundwater to irrigate cannabis crops on a commercial scale, then the number of people hauling water into Shasta Vista will likely decline no matter the County's motivations and no matter how disproportionately the ordinances weigh on any particular racial group.

Third, the amici argue County officials still face no deadlines, still enjoy broad discretion to deny applications, and can still delay and deny applications to applicants whose occupation of a particular property violates any County ordinance whatsoever. *See, e.g.*, *id.*; Siskiyou Cty. Code §§ 3.5-13.103 & .104. This argument, unlike the others, is compelling. The extraction ordinance permits the County to withhold permits and demand inspections of any property that will receive water. *See* Siskiyou Cty. Code § 3.5-13.103. County officials may then deny an application if that property becomes the subject of an administrative proceeding, and they can withhold a water extraction permit until the property is in compliance "with any and all applicable County Code sections." *Id.* § 3.5-13.104. The ordinances also demand that extracted groundwater be employed only for "uses and activities allowed by the underlying zoning designation of the parcel(s) receiving the extracted groundwater or uses that have received Conditional Use Permit approval or are legal non-conforming uses." *Id.* The vast majority of Shasta Vista parcels have not been properly developed with an approved single-family home, and the County's ordinances require a permanent water source. *See* Prelim. Inj. at 6. As summarized in this court's previous order, the County expected to grant very few permits even though most people in Shasta Vista rely primarily on trucked groundwater for all of their needs. *See id.* at 12.

Like the extraction ordinance, the trucking ordinance allows local officials to deny applications for water truck permits if an applicant does not possess "permits or licenses for the purported use for which water is being delivered," and officials may "investigate whether a parcel to which water will be delivered may legally conduct the activity for which the delivery is being made." Siskiyou Cty. Code § 3-4.1504(b). The trucking ordinance also grants local officials broad discretion to deny applications for lack of "good cause." *See id.* § 3.4-1504(a).

Interpreted literally, then, the two ordinances allow County officials to deny permits or withhold them indefinitely while an applicant obtains a permanent source of potable water and

1    demonstrates complete compliance with every provision of the County Code.  Kafkaesque though

2    this result may seem, lengthy delays are not hypothetical.  As noted above, one of the plaintiffs

3    claims his well-drilling application has been pending for about five years with no resolution

4    expected for two more years or more, *see* Koua Lee Decl. ¶ 6, ECF No. 62-1, and another claims

5    the County "is not allowing us to apply for permits", *see* Khue Cha Decl. ¶ 10, ECF No. 62-2.

6            In addition, although the County has simplified its permits, its ordinances did not require

7    those simplifications.  The water truck ordinance in fact authorizes local officials to seek much

8    more specific information.  *See, e.g.*, Siskiyou Cty. Code § 3-4.1504(b) ("In issuing permits, the

9    Siskiyou County Community Development Department, Environmental Health Division, may

10   require on its application the source of the water, its specific destination (e.g., address or APN),

11   the routes to be used, the dates of delivery, and any other information that will aid in enforcing

12   this Article.").  Permitting officials still could change the applications without warning or notice,

13   as they did while the plaintiffs' previous motion for a preliminary injunction was pending.  *See*

14   Dean Decl. ¶ 3.  In sum, the County has not shown the plaintiffs will likely be able to obtain

15   water for their basic needs if the court lifted the preliminary injunction.

16           At hearing, Mr. Donald clearly and unambiguously denied on the County's behalf that it

17   could reject water extraction or trucking permit applications simply because the destination

18   property did not comply with zoning regulations, contained unpermitted structures, or lacked a

19   permanent source of potable water.  The court appreciates these reassurances and does not doubt

20   Mr. Donald offered them in good faith.  The County could have revised its ordinances to give his

21   reassurances evidentiary heft, but it has not.  It could also have created an enforcement manual or

22   written guidelines to cabin local officials' discretion and prevent abuses, but now, as before, local

23   permitting officials have discretion to deny permits to almost anyone in Shasta Vista.  The

24   County has not shown the plaintiffs are likely to obtain water for their basic needs while this case

25   is pending, so it is has not shown they are no longer likely to suffer irreparable harm in the

26   absence of a preliminary injunction.

### 3.    Balance of Harms and Public Interest

The final two parts of the preliminary injunction test are the balance of harms and the broader public interest, which in this case are analyzed together. *See* Prelim. Inj. at 27 (citing *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)).  On one side of this balance, the three changes described above do not show the plaintiffs will suffer less severely; they go only to the County's motives and the likelihood of harm.  On the other side, the County has not shown that drought conditions, crime, environmental harms, and other problems associated with illegal cannabis cultivation have worsened since the court issued its previous order.  This part of the analysis is unchanged.  The balance of harms and public interest still weigh sharply in favor of an injunction.

## IV.   CONCLUSION

The motion to dissolve the preliminary injunction (ECF No. 57) is **denied**.  After considering the parties' responses to questions at oral argument, the court finds that a renewed settlement effort would be productive.  This action is **referred to a settlement conference** before the assigned magistrate judge, according to the court's current practice, to be conducted **as soon as possible**.  *See* E.D. Cal. L.R. 270(b).  The purpose of the settlement conference will be to identify mutually acceptable modifications to the preliminary injunction that will minimize the risk of irreparable harms to the plaintiffs while also allowing the County to prevent the irrigation of illegal commercial cannabis crops within its borders, including within the Mount Shasta Vista Subdivision.

IT IS SO ORDERED.

DATED:  May 12, 2022.

CHIEF UNITED STATES DISTRICT JUDGE

**APPENDIX**

**Sec. 3.5-13.101. Limitation on application of this article to groundwater extractions subject to section 3-13-301.**

The provisions of this article shall not apply to groundwater extractions that require a written permit pursuant to Section 3-13.301 of this Chapter.

Commercial groundwater extraction uses, whether subject to Section 3-13.301 or 3.5-13.102, shall also comply with the provisions of Chapter 6 of Title 10 of the Siskiyou County Code, which require commercial groundwater extraction uses be located in the appropriate zoning district and obtain all necessary permit approvals.

**Sec. 3.5-13.102. Administrative permit required for extraction of groundwater for use off-parcel.**

It shall be unlawful to extract groundwater of any nature or description, or for a property owner to allow such extraction on his or her land, or for any person to cause, permit, aid, abet, suffer, or furnish equipment or labor for such extraction, for the purpose of using the water or selling the water for use on other than the parcel of land upon which the extraction occurs, or contiguous parcels of land under the same ownership as the parcel from which the extraction occurs, without first obtaining an administrative permit as provided in this chapter.

It shall be unlawful to use water extracted in violation of this section on other than the parcel of land upon which the extraction occurs, or contiguous parcels of land under the same ownership as the parcel from which the extraction occurs, or for a property owner to allow such use on their land, or for any person to cause, permit, aid, abet, suffer, or furnish equipment or labor for such use, without first obtaining an administrative permit as provided in this Article.

An administrative permit shall be required in all instances in which groundwater is extracted and transported off the parcel from which it was extracted, including occasions in which groundwater is extracted, transported off-parcel, and returns to the parcel from which it was extracted. This provision does not apply to the extraction of water for the purposes of supplying a "public water system," a "community water system," a "noncommunity water system," or "small

21

1 community water system" as defined by the Health and Safety Code, serving residents of the
2 County of Siskiyou.

3      An administrative permit shall not be required in all instances in which groundwater is
4 extracted and transported off the parcel from which it was extracted for activities in which a
5 "License" or "Permit" is obtained from a public entity evidencing a legal activity requiring the
6 use of extracted groundwater off-site from which it was extracted. The Board of Supervisors shall
7 specify by resolution those "Licenses" and "Permits" that exempt a licensee or permittee from the
8 requirements of this Section.

9      For purposes of this Article, "parcel" shall mean a legal parcel. Where contiguous legal
10 parcels are under common ownership or control, such contiguous legal parcels shall be counted as
11 a single legal parcel for purposes of this Article.

12 **Sec. 3.5-13.103. Application for administrative permit.**

13      An application for a permit required by this Article shall be filed with the Siskiyou County
14 Community Development Department, Environmental Health Division, on forms provided by
15 said division and shall contain all information required by such division. Upon receipt of the
16 permit application, the Environmental Health Division, shall review the application with affected
17 county departments including, but not limited to, the Agricultural Commissioner and Planning
18 Director. After obtaining the comments of the affected county departments, the Environmental
19 Health Division, shall cause the application together with all received comments to be reviewed
20 by the Community Development Director, or his or her designee. Upon receipt of an application,
21 the Community Development Director, or his or her designee, may require an inspection of any or
22 all parcels associated with the application prior to the issuance of an administrative permit.

23 **Sec. 3.5-13.104. Granting of ministerial, administrative permit.**

24      In order to grant the ministerial, administrative permit, the purpose and use of
25 groundwater shall be incidental to a lawful activity. Extracted groundwater shall only be for uses
26 and activities allowed by the underlying zoning designation of the parcel(s) receiving the

22

1  extracted groundwater or uses that have received Conditional Use Permit approval or are legal

2  non-conforming uses.

3         The Community Development Director, or his or her designee, may withhold the

4  processing of and/or issuance of an administrative permit, where a Notice to Appear, Civil

5  Action, Notice to Comply, Administrative Citation, and/or a Notice and Order to Abate has been

6  issued and/or is pending administrative or judicial review on any of the associated parcels

7  requesting an administrative permit, until the subject property or properties are found to be in

8  complete compliance with any and all applicable County Code sections.

9  **Sec. 3.5-13.105. Appeal of decision.**

10         The decision of the Community Development Director, or his or her designee, is

11  appealable to the Board of Supervisors. An appeal must be filed in writing with the Clerk of the

12  Board within ten (10) days of the action taken by the Community Development Director, or his or

13  her designee, and must set forth the reason(s) for appeal with specificity.

14  **Sec. 3.5-13.107. Annual review of permit.**

15         The permit granted pursuant to this Article shall be for one year. At the request of the

16  applicant, the administrative permit may be reviewed by the Community Development

17  Department for a renewal term of one-year subject to the same criteria set forth in section 3.5-

18  13.104. Upon receipt of a request for renewal, the Community Development Director, or his or

19  her designee, may require an inspection of any or all parcels associated with the request prior to

20  the issuance of a renewed administrative permit. Said decision by the Environmental Health

21  Division, may be appealed to the Board of Supervisors by the applicant or any other affected

22  person.

23  **Sec. 3.5-13.108. Enforceability.**

24         Violations of this Article are unlawful and shall constitute a public nuisance and may be

25  enforced and abated through any available remedy provided by the Siskiyou County Code,

26  including Article 6 below, or any other federal, state, or local law.

**Section 3.5-13.109. Ordinance review.**

The Board of Supervisors shall on or about three years after this ordinance becomes effective review it and amend, repeal, or leave it unchanged, as the Board may determine is appropriate. Failure to carry out this Section shall not affect the enforceability of this Article.

**Sec. 3-4.1501. Water trucks prohibited on specified county roads.**

(a)      As used in this Article, "Water Truck" means a vehicle designed or being used to carry water of not less than 100 gallons or any vehicle designed for carrying or towing tanks or bladders of 100 gallons of water or more or a "Water Tender Vehicle," as defined in California Vehicle Code section 676.5. "Water Truck" does not include vehicles, such as a cement truck or a pesticide spray truck, that transport water as a mixture not suitable for irrigation.

(b)      Pursuant to the authority provided Siskiyou County under California Vehicle Code Section 21101(c), Water Trucks are prohibited from traveling over such streets (as defined in California Vehicle Code Section 590) and highways (as defined in California Vehicle Code Section 360) that the Board of Supervisors may specify by resolution. This prohibition does not apply to a Water Truck directly crossing through an intersection over a restricted street or highway.

**Sec. 3-4.1502. Signs.**

The prohibitions set forth in this article shall not be enforceable unless signs have been placed alongside the street or highway so as to warn drivers of the prohibitions.

**Sec. 3-4.1503. Penalties.**

In addition to any other available penalty, including Section 1-2.01, any person or company, including a corporation or limited liability company (LLC), violating any section of this article shall be guilty of an infraction or misdemeanor and shall be fined One Hundred and no/100ths ($100.00) Dollars or in an amount that the Board of Supervisors may specify by resolution, subject to the then-existing limitations of Vehicle Code 21104. To the maximum extent allowed under state law, any peace officer (as defined by California Penal Code Section 830 et seq.) in good standing that has completed Peace Officer Standards and Training (POST)

1    may enforce this Article. Violation of this Article, including falsification of an application for a

2    permit issued pursuant to it or the unauthorized alteration of a permit issued hereunder or

3    Siskiyou County Code Article 3.5 of Chapter 13 of Title 3, is grounds for permit revocation. A

4    person or entity who has had a permit revoked pursuant to this section shall be ineligible for

5    permit under this Article or Siskiyou County Code Article 3.5 of Chapter 13 of Title 3 for two (2)

6    years. Permit revocation is subject to appeal before the Board of Supervisors.

7    **Sec. 3-4.1504. Special permits.**

8    (a)    The Siskiyou County Community Development Department, Environmental

9    Health Division is hereby authorized, at its discretion, upon application in writing, and if good

10   cause exists, to issue a special permit, which may be made valid for the entire calendar year in

11   which it is issued, authorizing the applicant to operate a Water Truck that would otherwise be in

12   violation Section 3-4.1501.

13   (b)    In issuing permits, the Siskiyou County Community Development Department,

14   Environmental Health Division, may require on its application the source of the water, its specific

15   destination (e.g., address or APN), the routes to be used, the dates of delivery, and any other

16   information that will aid in enforcing this Article. In issuing permits, the Siskiyou County

17   Community Development Department, Environmental Health Division may require proof from

18   applicants that they possess any needed permits or licenses for the purported use for which water

19   is being delivered and investigate whether a parcel to which water will be delivered may legally

20   conduct the activity for which the delivery is being made.

21   (c)    The Siskiyou County Community Development Department, Environmental

22   Health Division may set up a process whereby the holder of a valid permit under this Article or

23   Siskiyou County Code Article 3.5 of Chapter 13 of Title 3 may submit for approval an additional

24   specific destination (e.g., address or APN) to which a water delivery may be made using streets

25   and highways otherwise restricted under Section 3-4.1501. Such specific destination shall be

26   provisionally approved for water delivery pending a final determination by the Siskiyou County

27   Community Development Department, Environmental Health Division, whether it is covered

28   under the permit issued under this Article or Siskiyou County Code Article 3.5 of Chapter 13 of

1   Title 3. The right to submit for provisional approval specific destinations under this subdivision

2   may be revoked if a permit holder submits two (2) consecutive destinations in a row later found to

3   be invalid. Proof of having summited a provisionally approval request for an additional specific

4   destination shall be carried by the driver of a Water Truck. Appeals revoking rights under this

5   subdivision may be made to the Board of Supervisors.

6          (d)     Any permit issued under Siskiyou County Code Article 3.5 of Chapter 13 of Title

7   3 satisfies this requirement.

8          (e)     Permit holders are required to have in their possession when driving a Water Truck

9   on a street or highway restricted under this Article the permit allowing such travel. The Siskiyou

10  County Community Development Department, Environmental Health Division may issue decals

11  signifying to peace officers possession of a permit allowing travel over restricted streets and

12  highways.

13  **Sec. 3-4.1505. Inapplicability.**

14         (a)     As used in this Section, "License" or "Permit" means a document provided the

15  driver of a vehicle from a public entity evidencing a legal activity requiring the transport of water

16  that the Board of Supervisors has specified by resolution exempts the holder of from Section 3-

17  4.1501.

18         (b)     The prohibition contained in this chapter does not apply to emergency vehicles,

19  governmental vehicles, vehicles of a contractor doing maintenance work and whose driver is in

20  possession of valid contract with a public entity for such work, a vehicle being driven by the

21  holder of timber harvest plan, and vehicles being driven by the holder of License or Permit as

22  defined in subdivision (a).

23         (c)     To the extent that any provision of this article conflicts with state or federal law,

24  either on its face or as applied, it shall be inapplicable to the extent of such conflict. The Board

25  hereby affirms that it intends that all remaining provisions not in conflict remain in effect.

1   **Sec. 3-4.1506. Ordinance review.**

2          The Board of Supervisors shall on or about three (3) years after this ordinance becomes

3   effective review it and amend, repeal, or leave it unchanged, as the Board may determine is

4   appropriate. Failure to carry out this Section shall not affect the enforceability of this Article.